[No. S055501. June 18, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYMOND OSCAR BUTLER, Defendant and Appellant.

COUNSEL

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Kate Johnston and Karen Hamilton, Deputy State Public Defenders, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Pamela C. Hamanaka, Assistant Attorney General, Keith H. Borjon, John R. Gorey and Noah P. Hill, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CORRIGAN, J.**—Defendant Raymond Oscar Butler was convicted of two counts each of murder, robbery, and carjacking.[1] On all charges, the jury found that defendant personally used a firearm; on the robbery and carjacking charges, it found that he inflicted great bodily injury.[2] The jury found as special circumstances that the murders were committed during the attempted commission of a robbery, and were multiple murders.[3] It fixed the penalty at death. We affirm the judgment.

## I. FACTS

The facts are summarized here for background purposes. Further factual and procedural details are provided in the discussion of defendant's appellate arguments.

### A. *Guilt Phase*

#### 1. *Prosecution*

On the night of March 25, 1994, defendant approached Takuma Ito and Go Matsuura in the parking lot of a Ralphs grocery store in San Pedro. Ito and

---

[1] Penal Code sections 187, subdivision (a), 211, and 215, subdivision (a). Further statutory references are to the Penal Code, unless otherwise specified.

[2] Sections 1203.06, subdivision (a)(1), 12022.5, subdivision (a), and 12022.7, subdivision (a).

[3] Section 190.2, subdivision (a)(3), (17).

Matsuura were Japanese citizens attending Marymount College. Ito had gotten out of his car; Matsuura was in the passenger seat. As Ito stood by the open driver's side door, defendant confronted him and demanded money. Defendant took Ito's wallet, removed cash from it, then forced Ito to the ground and shot him in the back of the head. After a brief pause, defendant fired several times into the car, also striking Matsuura in the head at close range. Defendant drove away in Ito's car, leaving his victims in the parking lot. Ito and Matsuura were taken to the hospital and kept on life support until their families arrived from Japan.

Ito's car was found the next day. Defendant was arrested a few days later, after an eyewitness identified him in a photographic lineup. He was later implicated in the murders by the three companions who drove with him to the Ralphs parking lot: his sister-in-law Kelli Waquan, Waquan's niece Christine Munoz, and Munoz's friend Irene Ruiz.

### 2. *Defense*

Only a minimal defense was presented at the guilt phase. Defense counsel established that fingerprints found inside Ito's car were not defendant's, and briefly questioned two police officers regarding their interviews with witnesses.

### B. *Penalty Phase*

#### 1. *Prosecution*

The centerpiece of the prosecution's penalty phase evidence was defendant's participation in the murder of a fellow jail inmate while defendant was awaiting trial for the Ito and Matsuura murders. The victim, Tyrone Flemming, and defendant were housed in a high-security unit. Flemming was generally disrespectful and abusive both to inmates and deputies in the jail. On the morning of March 26, 1995, Deputy Jose Mendoza prepared to take Flemming, Paul Gornick, Daniel Rivera, and defendant to the showers. He entered each cell to handcuff the inmates, then stepped behind the row gate and locked it. The procedure was for the inmates to approach the gate, at which point it would be opened and the deputy would escort them to the showers.

Mendoza called for Deputy John Hunter to open the four inmates' cell doors from a control booth. As they emerged, Mendoza saw that Gornick's right hand was uncuffed. Gornick unlocked the cuff on defendant's right hand. Gornick, defendant, and Rivera surrounded Flemming, who remained handcuffed, as did Rivera. Gornick began stabbing Flemming in the chest

with a metal shank, while defendant hit Flemming in the face with his fist, kicked him, and kneed him. Rivera kicked, kneed, and elbowed Flemming. After stabbing Flemming five to eight times, Gornick handed the shank to defendant. Defendant also stabbed Flemming five to eight times in the upper torso, while Gornick and Rivera struck and kicked him. Flemming managed to break away and run toward the row gate, where he fell to his knees. Gornick, Rivera, and defendant followed and kicked him while he was on the floor.

After Mendoza sprayed them with pepper spray, the attackers ran to the other end of the row. Defendant made an underhand throwing motion into one of the cells. Shortly thereafter, a toilet flushed. The three inmates lay on the floor of the row with their hands behind their backs. Deputies arrived and tended to Flemming, whose wounds proved fatal. When Mendoza and other deputies approached the attackers, Mendoza saw that Gornick and defendant were handcuffed again. The entire episode lasted less than a minute.

Deputies in the jail are unarmed. Inmates are aware that a fight involving a weapon will not be impeded until backup deputies arrive. Killing another inmate in front of a deputy gains the respect of other inmates, both in jail and in the subsequent prison environment. Hunter had called for backup as soon as he saw the attackers approach Flemming. When the row was searched, no shank was found. Inmates often dispose of a weapon by flushing it down the toilet when it is thrown into their cell after an attack. When Hunter heard the toilet flush, he shut off the water to the module, but the shank used to kill Flemming was not found. Inmates commonly have makeshift handcuff keys, and Gornick was known to be able to use them. There was no retaliation against defendant, Gornick, or Rivera. Ordinarily, there would have been a reprisal for an attack by Hispanics on an African-American inmate, unless there was an understanding between the groups. Flemming was African-American; defendant testified that he and Gornick were of mixed racial heritage, and associated with Hispanics in the jail.

The prosecution also presented evidence that on three occasions, prohibited razor blades were found in defendant's cell. In addition, a deputy testified that in February 1996, as he took defendant and other inmates back from court, defendant managed to free one hand from his cuffs and strike another inmate in the face with his fist, without provocation. This inmate was charged with setting a house fire in which his children had died. The prosecution also showed that defendant had been convicted of residential burglary in September 1993.

The fathers of Takuma Ito and Go Matsuura testified about their sons, and the impact of the murders on their families.

## 2. *Defense*

Defendant testified at the penalty phase. He said that on the day of the murders he had met with his probation officer, who persuaded him to check into a drug rehabilitation clinic. Afterward, he went to Kelli Waquan's house, drank some tequila, and decided to go out with her, Christine Munoz, and Irene Ruiz. Waquan, Munoz, and defendant left in Waquan's van around 6:30 p.m. and picked up Ruiz. Defendant had the revolver that he always carried when he went out. It was unloaded, but he had bullets in his pocket. He had no particular plan to use it. He had been given the gun by a fellow Rancho San Pedro gang member, because the gang was at war with the Crips.

Waquan drove to a liquor store and bought two bottles of Thunderbird, which defendant drank as they drove around. Defendant bought some crack cocaine, which he shared with Waquan. They bought more alcohol and crack cocaine, which all four smoked. They then bought more cocaine on credit and smoked that. Someone in the van brought up the idea of committing a robbery, but defendant maintained it was not his idea. By the time they got to the crime scene, defendant was quite inebriated.

In the Ralphs parking lot, defendant approached Ito and asked for a ride, intending to go somewhere else for the robbery. Ito pulled the car seat back for defendant to get in. Defendant had loaded his gun before leaving the van, and had it in his hand. As he was getting into the car, the gun went off by accident. Only then did he notice Matsuura in the car. He panicked and began shooting until his ammunition was gone. He could not remember what he was thinking at the time. He turned to go back to the van, but Waquan drove away. Defendant got into Ito's car and left in it. He did not know how the victims' bodies came to be in the positions where they were found in the parking lot.

The defense played tapes of three statements defendant gave after his arrest. In the course of these interviews, defendant eventually admitted that he alone had been the shooter, and expressed remorse for the victims and their families.

Regarding Flemming's murder, defendant testified that Gornick and Rivera were friends of his. Defendant disliked Flemming, who had verbally abused him, but the real conflict was between Gornick and Flemming. After a cell search, Gornick's address book had been mistakenly returned to Flemming's cell. Flemming threatened Gornick's family members, and the dispute was well known on the row. Gornick had to take action against Flemming, or the other inmates would consider him a coward. Other inmates testified about Flemming's threats against Gornick and his family.

Defendant knew that Gornick and Flemming were going to fight on the morning of the murder, but he expected only a fistfight. Gornick did not unshackle him when they left their cells. He and Rivera moved to shield Gornick and Flemming from the deputies' view. Defendant kept his back to the fight for most of the time, moving in an attempt to keep blocking the deputies' view, but he did see Gornick stab Flemming and the blood pour from Flemming's chest. Flemming was handcuffed and kicking at Gornick. He bumped into defendant as he attempted to escape, and kicked at him. Defendant kicked back three or four times, as he and Rivera tried to keep Flemming from reaching the row gate. After Mendoza hit him with pepper spray, defendant stepped away from the gate and Gornick handed him a shank. Defendant ran down the row and tossed the shank into a cell, knowing the inmate would flush it down the toilet. Defendant would have done the same if someone threw a shank into his cell. He lay down on the floor, still in his handcuffs, which were never unlocked during the attack.

Defendant testified that he had razor blades in his cell for general use, not as weapons. He said he had struck the accused child-killer after unlocking his handcuffs with a makeshift key because other inmates would consider him a "punk" if he did not take the opportunity to do so.

Defendant told the jury that he first drank alcohol when he was eight years old, and was drinking regularly by age 11 or 12. He began using marijuana when he was 12 or 13, and harder drugs a year later. At the age of 15 or 16, his use was habitual and he was selling drugs to support his habit. He had a daughter, whom he had never met but with whom he planned to establish a relationship while in jail.

Defendant's relatives testified to a family history of drug and alcohol abuse. Defendant was a slow learner in grade school, and was often absent. He had asthma and his mother kept him home frequently. He attended three different junior high schools, often fighting to protect his younger brother. He transferred from high school to a continuation school in 10th grade because he was failing and not attending class. He dropped out of the continuation school after a year. He never earned a high school equivalency degree.

On March 22, 1993, at the age of 17, defendant attempted suicide with pills and alcohol. He testified that the attempt was the result of arguing with his mother about his girlfriend. He tried to overdose on two other occasions. He was diagnosed with major depression, polysubstance abuse, antisocial personality traits, and a "parent-child problem." He told a psychiatrist that he had a gun, would use it to make money, and was willing to kill someone for that purpose. Although he was cooperative at times, defendant became abusive and hostile in the hospital and was discharged early at his family's request.

Defendant testified that his burglary conviction resulted from an incident in which he had served as a lookout while someone else entered a residence to steal speakers. He was arrested the same day and pleaded no contest. He was sentenced to a year in jail on September 15, 1993, and released about three months before the murders. His probation officer testified that defendant had violated the conditions of his probation by using drugs, failing to appear for drug testing, failing a drug test that he did take, and failing to report to the officer. On the day he killed Ito and Matsuura, defendant's mother brought him to meet his probation officer. The officer told him he was in violation of his probation, would have to go to court, and could be sentenced to prison, though enrolling in a drug program might be viewed positively by the court.

A clinical psychologist interviewed defendant and reviewed his family history, as well as school, medical, and criminal records. He diagnosed defendant with polysubstance abuse and cocaine-induced psychotic disorder with delusions. Defendant had a borderline personality and moderate depression. His general adaptive functioning was normal, and there was no evidence of brain damage.

## II. DISCUSSION

### A. *Denial of Defendant's Joinder Motion*

On February 7, 1996, defendant moved to consolidate trial of the Ito and Matsuura murders (the Long Beach case) with the Flemming murder trial (the Compton case). Jury selection was set to begin on February 21 in Long Beach. A pretrial hearing was set for February 14 in Compton, where Gornick and Rivera were charged as codefendants. The Compton information alleged a special circumstance against Gornick, though a determination to seek the death penalty against him had not yet been made. No special circumstances were alleged against defendant in the Compton case at that point.

In a declaration supporting joinder, defense counsel claimed that the prosecutor had told the Compton judge that if the Long Beach jury did not return the death penalty, the Compton charges would be amended to use the Long Beach murders as special circumstances. Thus, he asserted, the prosecutor was keeping the cases separate in order to have two opportunities to obtain the death penalty based on the same set of facts. Counsel cited no authority in his papers other than section 954.[4] He argued that consolidation

---

[4] In relevant part, section 954 provides: "An accusatory pleading may charge two or more different offenses . . . of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated."

would be efficient because "it can be expected that [defendant's] case will be severed from his codefendants'."

The prosecutor opposed joinder, contending it would cause unnecessary delay and complexity. She noted that defense counsel had known for months that the Flemming murder would come up in the Long Beach penalty phase, but had waited until the eve of trial to seek joinder. The murders in the two cases were factually unrelated. Consolidation would require the jury to consider different legal theories, felony murder in the Long Beach case and willful murder in the Compton case. Gornick and Rivera were not ready to proceed to trial, nor was the prosecution, which had not yet determined whether Gornick would face the death penalty. Gornick and defendant were both proceeding in propria persona in Compton. While defense counsel in the Long Beach case was acting as defendant's advisory counsel in Compton, no advisory counsel had yet been appointed for Gornick. The prosecutor argued that it would be unfair to Gornick and Rivera to combine their trial with defendant's capital case. If severance was the answer to this problem, it was premature of defendant to seek consolidation in the first place.

At the hearing on the motion, defense counsel emphasized that he did not intend to include the Gornick and Rivera prosecutions in the consolidation, but to sever defendant's case from theirs. He claimed that all three defendants were likely to seek severances in the Compton case. The court denied the motion. It noted that before it could consider consolidating defendant's cases, it would have to provide notice and a hearing to Gornick and Rivera on the question of severance. Although defense counsel asserted that Gornick and Rivera would not oppose a severance, based on his conversations with their counsel, the court was unwilling to countenance the complications and delays entailed in consolidation.

Defendant recognizes that granting joinder is a matter of discretion. Section 954 "permits but does not require joinder under some circumstances." (*People v. Marlow* (2004) 34 Cal.4th 131, 143 [17 Cal.Rptr.3d 825, 96 P.3d 126].) Defendant claims the court abused its discretion here.[5] He does not dispute that undue complication would have arisen if the Gornick and Rivera charges had been included in a consolidated trial. His argument presupposes that the Gornick and Rivera cases would have been severed. However, he did not seek a severance in Compton, or make a competent showing of what the other defendants' position on severance was. Defense counsel could not

---

[5] He asserts violation of his right to an unbiased jury under article I, section 16 of the California Constitution and the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution, his right to correct application of state law as a matter of due process under the Fifth and Fourteenth Amendments to the federal Constitution, and his right to a reliable penalty determination under the Eighth Amendment to the federal Constitution.

speak for Gornick or Rivera. Indeed, he could not speak for defendant's interests in the Compton case, because defendant was representing himself in that proceeding. Although present at the hearing on the joinder motion, defendant did not make his position known. Instead of seeking defendant's cooperation in pursuing a severance, defense counsel waited until shortly before the Long Beach trial to seek consolidation, based merely on the prospect of a severance in the other case and on his personal assurances regarding the views of Rivera's counsel and Gornick on the subject. Faced with the uncertainty, complication, and delay arising from the severance question alone, the trial court was well within its discretion to deny defendant's joinder motion.

### B. *Limitation of Voir Dire*

At the same hearing, the prosecutor raised a voir dire matter. She noted that defense counsel had said he would ask the court to question jurors about the "third killing in jail." The prosecutor strongly objected to this idea, contending it would be reversible error to inform the jury about a third killing of which defendant had not been convicted. She asked the court to require written submissions on the propriety of such questioning.

Defense counsel responded that the penalty phase was the most crucial part of the case, and he wanted to explore whether any juror "would automatically vote for death, if they knew about the jail killing." He claimed, "The only way I can know that is if they have been asked, knowing that [defendant] is charged in this jail killing and is involved in this jail killing." Counsel noted that a jailhouse killing was powerful evidence suggesting defendant would be a threat even if imprisoned for life. He argued that it would be unfair for the jury to "suddenly" learn about such an event for the first time at the penalty phase, and that allowing the prosecutor to "surprise the jury with this evidence" would be "devastating to my client." He offered to make any waivers necessary to permit the jury to be told that defendant "was involved in a killing inside the jail."

The prosecutor declared that the jury would be "irreparably taint[ed]" in their guilt phase deliberations if they knew about the third killing. She claimed the jury questionnaire, which addressed the fact that the case involved "multiple killings," was sufficient to explore the jurors' attitudes about the death penalty.

The court said it had given this question "a great deal of thought," and had concluded it would be inappropriate "to go into aggravating and mitigating circumstances in the specifics, not the abstract." It would be enough to question the jurors generally about "multiple killings," without "asking them to prejudge the case."

The juror questionnaire asked whether "[a]nyone who intentionally kills more than one person without legal justification and not in self defense, should receive the death penalty." Before voir dire began, defense counsel asked the court, "I gather you do not want me to say anything about the jail killing . . . is that correct?" The court responded in the affirmative, telling counsel he was free to follow up on any responses from the questionnaires, but not to "get into details of the facts of the case."

■ Defendant contends this restriction on voir dire was an abuse of discretion, and denied him his right to a fair and impartial jury.[6] We recently summarized the law governing this issue in *People v. Zambrano* (2007) 41 Cal.4th 1082 [63 Cal.Rptr.3d 297, 163 P.3d 4]: " '[T]he trial court has "considerable discretion . . . to contain voir dire within reasonable limits" [citations]. This discretion extends to the process of death-qualification voir dire established by *Witherspoon v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] and *Wainwright v. Witt* [(1985)] 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844]. [Citation.] Limitations on voir dire are subject to review for abuse of discretion. [Citation.]' (*People v. Jenkins* (2000) 22 Cal.4th 900, 990 [95 Cal.Rptr.2d 377, 997 P.2d 1044] (*Jenkins*).)

■ "Moreover, as we have said on many occasions, '[d]efendant ha[s] no right to ask specific questions that invite[] prospective jurors to prejudge the penalty issue based on a summary of the aggravating and mitigating evidence (*People v. Cash* (2002) 28 Cal.4th 703, 721–722 [122 Cal.Rptr.2d 545, 50 P.3d 332]), to educate the jury as to the facts of the case (*People v. Sanders* (1995) 11 Cal.4th 475, 538–539 [46 Cal.Rptr.2d 751, 905 P.2d 420]), or to instruct the jury in matters of law (*People v. Ashmus* (1991) 54 Cal.3d 932, 959 [2 Cal.Rptr.2d 112, 820 P.2d 214]).' (*People v. Burgener* (2003) 29 Cal.4th 833, 865 [129 Cal.Rptr.2d 747, 62 P.3d 1]; see also, e.g., *People v. Mason* (1991) 52 Cal.3d 909, 939–941 [277 Cal.Rptr. 166, 802 P.2d 950] (*Mason*).)

■ "We have explained that '[t]he *Witherspoon-Witt* . . . voir dire seeks to determine only the views of the prospective jurors about capital punishment in the abstract . . . . The inquiry is directed to whether, without knowing the specifics of the case, the juror has an "open mind" on the penalty determination.' (*People v. Clark* (1990) 50 Cal.3d 583, 597 [268 Cal.Rptr. 399, 789 P.2d 127] . . . .) In *Mason*, alluding to the facts there presented, we said that '[m]any persons whose general neutrality toward capital punishment qualifies them to sit as jurors might, if presented with the gruesome details of a multiple-murder case, conclude that they would likely, if not automatically, vote for death.' (*Mason, supra*, 52 Cal.3d 909, 940; see also *People v. Sanders, supra*, 11 Cal.4th 475, 539.)

---

[6] Defendant relies on the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, sections 7, 15, 16, and 17 of the California Constitution.

"On the other hand, we have indicated that because ' "[a] prospective juror who would invariably vote either for or against the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating and mitigating circumstances, is . . . subject to challenge for cause," ' the death qualification process 'must probe "prospective jurors' death penalty views as applied to the general facts of the case, whether or not those facts [have] been expressly charged." ' (*People v. Earp* (1999) 20 Cal.4th 826, 853 [85 Cal.Rptr.2d 857, 978 P.2d 15] . . . .)

"Reconciling these competing principles dictates that 'death-qualification voir dire must avoid two extremes. On the one hand, it must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried. On the other hand, it must not be so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be presented. [Citation.] In deciding where to strike the balance in a particular case, trial courts have considerable discretion. [Citations.]' (*People v. Cash, supra,* 28 Cal.4th 703, 721–722 . . . .)" (*People v. Zambrano, supra,* 41 Cal.4th at pp. 1120–1121; see also *People v. Carasi* (2008) 44 Cal.4th 1263, 1285–1287 [82 Cal.Rptr.3d 265, 190 P.3d 616].)

■ We cannot say the court abused its considerable discretion in this instance. In 1996, when the court made its ruling, the law was clear that "[i]t is not a proper object of voir dire to obtain a juror's advisory opinion based upon a preview of the evidence," and that the relevant inquiry was the juror's "general neutrality toward capital punishment." (*People v. Mason, supra,* 52 Cal.3d at p. 940.) The court could reasonably rely on our advisement that "[t]he inquiry is directed to whether, without knowing the specifics of the case, the juror has an 'open mind' on the penalty determination." (*People v. Clark, supra,* 50 Cal.3d at p. 597.)

■ Defendant places great reliance on our subsequent decision in *People v. Cash, supra,* 28 Cal.4th 703. There, however, the trial court's error was "precluding mention of any general fact or circumstance not expressly pleaded in the information." (*Id.* at p. 722.) Moreover, the question the defendant was barred from asking in *Cash* was "whether prospective jurors could return a verdict of life without parole for a defendant who had killed more than one person, without revealing that defendant had killed his grandparents." (*Id.* at p. 719.) Here, the court did not prevent counsel from raising matters beyond the allegations in the information, and counsel did not seek to ascertain the jurors' attitudes on other murders in general, or even on jailhouse murders in general. He wanted to inform them that *defendant* was

involved in a jailhouse killing, and to explore their attitudes based on that case-specific information. The court properly refused to allow this line of inquiry. "[A] defendant cannot insist upon questions that are ' "so specific" ' that they expose jurors to the facts of the case . . . ." (*People v. Carasi, supra*, 44 Cal.4th at p. 1286.)

There was no merit in defense counsel's complaint that the jury would be surprised if it "suddenly" learned about the jailhouse killing at the penalty phase. It is not unusual for new information to be brought forward at that point in a capital trial. Defense counsel was free during voir dire to explore the prospective jurors' general attitudes about jailhouse killings and whether the death penalty is always appropriate for such perpetrators. However, our cases make it clear that counsel was not entitled to do what he sought to do here: tell the panel that his client "is charged in this jail killing and is involved in this jail killing."

### C. *Defendant's Absence from Certain Proceedings*

■ Defendant claims the court violated his constitutional and statutory rights by conducting various proceedings in his absence.[7] Under the Sixth Amendment, a defendant has the right to be personally present at any proceeding in which his appearance is necessary to prevent "interference with [his] opportunity for effective cross-examination." (*Kentucky v. Stincer* (1987) 482 U.S. 730, 744–745, fn. 17 [96 L.Ed.2d 631, 107 S.Ct. 2658]; see *People v. Harris* (2008) 43 Cal.4th 1269, 1306 [78 Cal.Rptr.3d 295, 185 P.3d 727].) Due process guarantees the right to be present at any "stage . . . that is critical to [the] outcome" and where the defendant's "presence would contribute to the fairness of the procedure." (*Stincer*, at p. 745; see *Harris*, at p. 1306.)

"The state constitutional right to be present at trial is generally coextensive with the federal due process right. (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1357 [65 Cal.Rptr.2d 145, 939 P.2d 259]; *United States v. Gagnon* (1985) 470 U.S. 522, 526 [84 L.Ed.2d 486, 105 S.Ct. 1482].)" (*People v. Harris, supra*, 43 Cal.4th at p. 1306.) Neither the state nor the federal Constitution, nor the statutory requirements of sections 977 and 1043, require the defendant's personal appearance at proceedings where his presence bears no reasonable, substantial relation to his opportunity to defend the charges against him. (*Harris*, at p. 1306; *People v. Cole* (2004) 33 Cal.4th 1158, 1231 [17 Cal.Rptr.3d 532, 95 P.3d 811].)

---

[7] As to the federal Constitution, defendant refers to his right to a fair trial under the Sixth Amendment, and his due process rights under the Fifth and Fourteenth Amendments. He also relies on article I, section 15 of the California Constitution, and Penal Code sections 977 and 1043.

Defendant claims the most critical proceedings held in his absence occurred during the penalty phase, on March 19 and 20, 1996. The events of the previous two court days provide the context of his claims. On Friday, March 15, defendant was present at a hearing on penalty phase procedures and evidence. The matter of Paul Gornick's testimony arose, and the prosecutor informed the court that the defense had a statement from Gornick, a codefendant in the Compton prosecution for the jailhouse stabbing. Gornick, however, had said he would assert his privilege against self-incrimination if called to testify in Long Beach. The prosecutor objected to any use of Gornick's statement under those circumstances, and requested a hearing at which she could question Gornick about the incident and his willingness to testify. Gornick, representing himself, was called to the stand and said he needed to consult with his advisory counsel before deciding whether to testify in defendant's case. The court scheduled a hearing on Monday to question Gornick with advisory counsel present.

The parties also discussed the admissibility of defendant's statements to the police expressing remorse for the Long Beach killings. The prosecutor objected on hearsay grounds. Defense counsel said he would research the matter over the weekend, and informed the court that he had yet to decide whether defendant would testify.

Defense counsel also asked the court to authorize an electroencephalogram (EEG) for defendant. He suggested that defendant could be absent for the hearing on Monday, in order to be at the jail hospital for the EEG. The court said it was "very hesitant to conduct these hearings without him being present." Counsel, however, renewed his request to waive defendant's presence on Monday, noting that "it's legal issues only," and that Gornick's testimony would be "the only reason [defendant] would really need to be here." The prosecutor was opposed to the idea, and counsel yielded, saying, "We'll have him here. We'll do the best we can on the EEG."

On Monday, March 18, defendant was present and the court authorized the EEG. The court had received points and authorities from both sides on the admissibility of the written statements from Gornick and defendant. Gornick's advisory counsel said his client would invoke the Fifth Amendment in response to all questions if called to testify. Gornick himself confirmed this decision. The court heard the parties' arguments on the admissibility of the statements, and took a recess to review the evidence. When proceedings resumed, the court announced that an EEG appointment had been made for 1:00 p.m. on the next day, Tuesday, March 19. It noted that defendant could be brought to court for opening statements on Tuesday morning, or the proceedings could be cancelled for the entire day. The parties agreed to proceed with opening statements only.

The court then made its ruling, excluding as hearsay all the statements offered by the defense. It noted, however, that the officers who took defendant's statements could testify to his expressions of remorse. Defense counsel said he would consult with defendant about whether he should testify about the jail killing only. The court and the prosecutor were skeptical that the testimony could be so limited. The defense requested time to consider the matter, and to permit research on limiting the scope of defendant's testimony. Counsel was doubtful that he could prepare his opening statement without resolving these questions. Because the EEG was scheduled for the next day, counsel asked to delay his opening statement until Wednesday. The court suggested putting both opening statements over, and the prosecutor agreed.

The court asked defendant if this arrangement was agreeable with him, and defendant said yes. Defense counsel asked, "you do understand we also may be discussing this legal issue of whether or not testimony can be limited in your absence. Is that okay with you?" Again, defendant said yes.

Defendant was not present on Tuesday morning. Counsel informed the court that he was having some difficulty finding time to confer with his client. The court then excused the jury for the day, with apologies. It explained that while the parties had wanted to begin the penalty phase on Wednesday, the court had decided to start on Tuesday "in my effort to move things along." However, the parties were not ready to proceed even though "both counsel have been working very hard to get the second phase ready for [you]." The court said it was sorry to have inconvenienced the jury by having them come in, and told them to return the next morning.

The attorneys then discussed case law on the subject of limited testimony. Defense counsel was unsure whether he would actually seek to limit the scope of defendant's testimony. The court reserved its decision, and said it would try to arrange for counsel to have time to talk with defendant the next day. The only other subject discussed at this hearing was broached by a media representative, who asked the court about restrictions on photography in the courtroom. The court explained its position, admonished the representative about abiding by previous rulings, and adjourned the proceedings.

Defendant was present the next morning, Wednesday, March 20. At a sidebar conference, defense counsel said that defendant would testify. The proceedings on this date to which defendant now objects took place in chambers, after the opening statements. The court noted that defendant was not present, and asked if that was "agreeable with counsel." Defense counsel said yes. The court and both counsel then reviewed photographs of Flemming and defendant following the jail stabbing. The court asked the prosecutor to make choices from certain pictures the court deemed duplicative. Defense counsel had no objection to the photographic evidence.

During the discussion of the photographs, defense counsel mentioned that defendant would admit he had participated in the assault, but deny he had stabbed Flemming. The prosecutor asked for an indication of what defendant's testimony would be, so that she could prepare for questioning her witnesses. Counsel said he was unable to provide any particulars. He explained that he had only been able to speak with defendant for 25 minutes that morning, and they had not gone into the details of his testimony. The court asked counsel "to turn that over to [the prosecutor] as soon as you know." The chambers discussion then ended. Defense counsel made no mention of the idea of limiting the scope of defendant's testimony.

Defendant argues that his presence at the hearing on March 19 and the chambers conference on March 20 was crucial for purposes of his right to decide whether or not to testify. He argues that "[h]olding proceedings where elements bearing on that personal right were decided in his absence resulted in a fundamentally unfair process." The argument fails because nothing was "decided" about defendant's testimonial rights at either of these hearings. On the 19th, the court and counsel discussed in a preliminary fashion whether the scope of a defendant's testimony can be limited, a subject defense counsel did not thereafter pursue. On the 20th, the prosecutor inquired about the substance of defendant's planned testimony, but defense counsel was unable to provide any details. These discussions cannot be deemed critical to the outcome of the penalty phase, or to have any reasonable, substantial relation to defendant's opportunity to defend himself. (*Kentucky v. Stincer, supra*, 482 U.S. at pp. 744–745, fn. 17; *People v. Harris, supra*, 43 Cal.4th at p. 1306.) Contrary to defendant's assertions, his right to be present did not extend to these tentative explorations of his possible testimony. (See *People v. Holt* (1997) 15 Cal.4th 619, 706–707 [63 Cal.Rptr.2d 782, 937 P.2d 213].)

Defendant also argues that on March 20, he could have advised his counsel about the accuracy of the photographs of Flemming and other relevant details of the assault.[8] However, he makes no claim on appeal that the photographs were inaccurate or unduly prejudicial, or that he was denied the right to challenge their admission at trial. He suggests nothing counsel might have done differently had he been able to consult with defendant about the circumstances of the jail killing. As in *People v. Holt, supra*, 15 Cal.4th at page 707, which also involved a discussion about the use of photographs, "there is no indication that defendant's presence at these proceedings might have had any impact."

Defendant's claims regarding other proceedings held in his absence are similarly devoid of merit. He asserts he was entitled to be present when

---

[8] The parties do not mention whether the defense was given copies of the photographs during discovery.

testimony was read back to the jury during its deliberations. "We have repeatedly stated that the rereading of testimony is not a critical stage of the proceedings. (See, e.g., *People v. Ayala* (2000) 23 Cal.4th 225, 288 [96 Cal.Rptr.2d 682, 1 P.3d 3] . . . ; *People v. Horton* (1995) 11 Cal.4th 1068, 1120 [47 Cal.Rptr.2d 516, 906 P.2d 478]." (*People v. Cox* (2003) 30 Cal.4th 916, 963 [135 Cal.Rptr.2d 272, 70 P.3d 277].) He complains he was absent during a discussion of jury instructions, another phase for which we have held defendants need not be present. (*People v. Riel* (2000) 22 Cal.4th 1153, 1195–1196 [96 Cal.Rptr.2d 1, 998 P.2d 969]; *People v. Waidla* (2000) 22 Cal.4th 690, 742–744 [94 Cal.Rptr.2d 396, 996 P.2d 46].) The same analysis applies to a supplemental instruction on the definition of "possession" (CALJIC No. 1.24), which the court and counsel agreed to provide during a telephonic conference held in response to a question from the jury.

Finally, defendant contends he was entitled to be present for proceedings during which the court and counsel discussed voir dire procedures, in the absence of the prospective jurors. Again, we have held that this is not a critical stage for purposes of a defendant's constitutional and statutory rights to be present. (*People v. Cole, supra*, 33 Cal.4th at pp. 1230–1231; *People v. Holt, supra*, 15 Cal.4th at pp. 706–707 & fn. 29.) Defendant points to nothing that occurred during the conferences in this case, held on February 21 and 26, 1996, that would justify an exception to the general rule.

### D. *Exclusion of the Gornick Statement*

Defendant claims the trial court's exclusion of Gornick's statement violated defendant's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. Gornick had told defense counsel and an investigator during a jailhouse interview that he did not want his statement turned over to the district attorney unless it was absolutely necessary. He said he would be claiming self-defense at his own trial, and that if called as a witness in defendant's case he would assert his privilege against self-incrimination.

Gornick then gave counsel and the investigator the following version of Flemming's killing. Flemming had threatened Gornick's life, and threatened his family after obtaining Gornick's address book. The two made a "deal" to fight when they came out of their cells for showers. No one else was to be involved. When the doors opened, both he and Flemming had one hand free. It was supposed to be a "knockdown-type fight," but Flemming had a shank. When Flemming dropped the weapon, Gornick dove on it and used it in self-defense. There was blood everywhere, and no deputies in the area for several seconds. Defendant was never uncuffed during the episode, and "the deputy was not where he said he was." Evidently, Gornick referred here to

Deputy Mendoza's preliminary hearing testimony. Gornick explained that defendant got blood on himself "from the towels while he was on the ground."

The prosecution moved to exclude the statement as hearsay. Defendant filed points and authorities in opposition, claiming the statement was a declaration against interest because Gornick had exposed himself to the death penalty. Gornick appeared in court and affirmed his intention to assert his Fifth Amendment privilege if called to testify, as discussed in part II.C, *ante*, at page 862. The court excluded the statement, noting that a declaration against interest must be so contrary to the declarant's interest that a reasonable person would not have made it without believing it to be true. The court expressed doubt that Gornick's statement was actually against his interest. His presence at the scene with a weapon in his hand was indisputable, and he claimed the killing was in self-defense and the defense of others. Furthermore, the court observed that Gornick had refused to testify about the incident even as he gave the statement, and left out critical details that would ordinarily be the subject of cross-examination, such as where defendant was and what he did during the attack. The court concluded that "it's very convenient and very deliberate, I think, and very intentional. And to me, it makes it untrustworthy and unreliable."

This discretionary ruling will not be overturned unless it was so arbitrary as to result in a miscarriage of justice. (*People v. Geier* (2007) 41 Cal.4th 555, 585 [61 Cal.Rptr.3d 580, 161 P.3d 104].) That standard has not been met; the reasons given by the court amply justified its conclusion. The trustworthiness of a statement against penal interest is the focus of the inquiry, and we rely on the trial court to apply its understanding of human nature in the circumstances presented, including the declarant's motivations and his relationship with the defendant.[9] (*Geier*, at p. 584.) Here, the court accurately noted that Gornick attempted to justify his actions, rather than to incriminate himself. Moreover, he made his statement fully intending to insulate himself from questioning, and provided only a minimal account of defendant's actions. These factors seriously undermined the trustworthiness of the statement.

██ Defendant contends he was constitutionally entitled to present Gornick's statement regardless of its admissibility under the hearsay rule, citing *Chambers v. Mississippi* (1973) 410 U.S. 284, 302 [35 L.Ed.2d 297,

---

[9] In relevant part, Evidence Code section 1230 provides: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." Gornick's invocation of his Fifth Amendment privilege made him unavailable as a witness. (Evid. Code, § 240, subd. (a)(1).)

93 S.Ct. 1038], and *Green v. Georgia* (1979) 442 U.S. 95, 98 [60 L.Ed.2d 738, 99 S.Ct. 2150]. Both those cases, however, require substantial indications of reliability, and we have held that "[t]he same lack of reliability that makes . . . statements excludable under state law makes them excludable under the federal Constitution." (*People v. Livaditis* (1992) 2 Cal.4th 759, 780 [9 Cal.Rptr.2d 72, 831 P.2d 297]; accord, *People v. Smith* (2003) 30 Cal.4th 581, 629 [134 Cal.Rptr.2d 1, 68 P.3d 302].)

Defendant argues that Gornick's assertion of self-defense did not detract from the reliability of his statement because the defense may not have been legally sufficient. However, the trial court could reasonably conclude that Gornick was fabricating a defense, as its comments suggested. Even taken at face value, there was no indication Gornick lacked confidence in the legal merits of his claimed defense. Defendant also asserts that Gornick's reliance on his privilege against self-incrimination showed he was concerned about the inculpatory nature of his statement. Be that as it may, it also demonstrated his unwillingness to expose himself to cross-examination at the same time he provided defendant's attorney with a limited version of the events. The trial court properly considered these circumstances in evaluating the reliability of Gornick's statement.

### E. *Penalty Phase Instructional Issues*

#### 1. *Refusal to Instruct on Self-defense or Manslaughter*

The prosecutor requested murder instructions in connection with the stabbing of Flemming. Defense counsel requested instructions on voluntary and involuntary manslaughter, self-defense, and unreasonable self-defense. After hearing argument, the court decided the evidence would not support a finding that either defendant or Gornick had a belief in the need for self-defense, reasonable or unreasonable. The court also considered whether a heat of passion theory of manslaughter might be sustainable, and concluded it was not. The court did decide to instruct on assault with a deadly weapon or by force likely to produce great bodily injury. Thus, the jury could consider whether defendant aided and abetted an assault instead of a murder. However, the court rejected defense counsel's argument that defendant may have aided and abetted only a battery, so that Flemming's killing might be deemed a misdemeanor manslaughter.

On appeal, defendant contends the court's rulings violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and his state constitutional rights to present a defense, to a fair trial, to due process, and to equal protection. He claims he was entitled to instructions on manslaughter as a lesser included offense of murder. However, we have

"not decide[d] whether a trial court is ever obligated to instruct on lesser offenses requested by trial counsel at a penalty phase." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1148 [40 Cal.Rptr.3d 118, 129 P.3d 321].) Defendant was not charged with Flemming's murder in this case. Evidence of the attack in jail was presented as an aggravating circumstance under section 190.3, factor (b): "criminal activity by the defendant which involved the use or attempted use of force or violence." Whether the assault amounted to murder or manslaughter was beside the point. "The proper focus for consideration of prior violent crimes in the penalty phase is on the facts of the defendant's past actions as they reflect on his character, rather than on the labels to be assigned the past crimes [citation] or the existence of technical defenses to prior bad acts [citation]." (*People v. Cain* (1995) 10 Cal.4th 1, 73 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)

■ Nevertheless, counsel may request instruction on the elements of offenses presented under section 190.3, factor (b). (See *People v. Guerra, supra*, 37 Cal.4th at p. 1147.) Here, defense counsel proposed instructions on the elements of manslaughter and various related theories. The trial court correctly determined that the evidence was inadequate to support these instructions. Defendant argues that the jury could have found that he acted in reasonable or unreasonable defense of Gornick, who himself acted in self-defense. But both self-defense and defense of others, whether perfect or imperfect, require an actual fear of *imminent* harm. (*People v. Randle* (2005) 35 Cal.4th 987, 994–997 [28 Cal.Rptr.3d 725, 111 P.3d 987].) Here, Flemming's threats against Gornick's family did not pose an immediate threat. By defendant's own account at trial, the fight was planned in advance, and Flemming was handcuffed throughout the assault. Neither defendant nor the other eyewitness, Deputy Mendoza, saw Flemming with a weapon of any kind. Defendant notes there was testimony that a piece of metal, which could have been used to make a shank, had previously been confiscated from Flemming's cell. This does not indicate that Flemming was armed when he was attacked. Without any evidence to support a finding that Gornick or defendant feared imminent harm, there was no basis to argue self-defense or defense of others.

■ Defendant also claims a voluntary manslaughter instruction was justified under the theory that he and Gornick acted in the heat of passion or upon a sudden quarrel. However, the fact that defendant knew Gornick had planned the assault in advance showed that both of them acted deliberately and upon reflection. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 583–584 [36 Cal.Rptr.3d 340, 123 P.3d 614].) Defendant suggests he and Gornick were provoked by the sight of the shank. This speculation is not supported by anything in the testimony. In any event, " '[t]he provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have

been engaged in by the victim.' " (*Manriquez*, at p. 583.) Here, there was no evidence that Flemming had any role in the production of the shank.

Finally, defendant contends involuntary manslaughter instructions were proper because the jury could have found that he intended to participate only in a misdemeanor battery. (See *People v. Benavides* (2005) 35 Cal.4th 69, 102–103 [24 Cal.Rptr.3d 507, 105 P.3d 1099].) This theory is also untenable. Defendant admitted that after he saw Flemming bleeding heavily from the wounds inflicted by Gornick, he continued to block the deputy's view of the fight, kick Flemming, and block him from reaching the row gate. Whatever defendant may have anticipated at the outset, by his own account he knowingly participated in an assault with a deadly weapon. No reasonable jury could have found that this violent and bloody incident was a misdemeanor battery. The court properly declined to instruct on involuntary manslaughter.

### 2. *Failure to Give CALJIC No. 8.71*

Defense counsel requested CALJIC No. 8.71, which informs the jury that a defendant is entitled to the benefit of a reasonable doubt as to whether murder was of the first or second degree. The prosecutor had no objection, and the court agreed. However, the instruction was not given. Defendant contends this omission violated his rights to due process, a fair trial, and a reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. He is mistaken.

As explained in part II.E.1, *ante*, at pages 867–868, defendant was not charged with murder in the penalty phase. The jury was not required to fix any degree or classification of homicide in its deliberations regarding defendant's role in the killing of Flemming. The court told the jury that there was evidence of defendant's commission of murder and assault with a deadly weapon, and that "[b]efore a juror may consider any of such criminal acts as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant did, in fact, commit such criminal acts." This instruction correctly informed the jury of the applicable standard of proof.

### 3. *The Aiding and Abetting Instruction*

Also in connection with the Flemming killing, the court instructed the jury on aiding and abetting liability, as follows: "In order to find the defendant guilty of the crime of murder, you must be satisfied beyond a reasonable doubt that: One, the crime of murder was committed; two, the defendant aided and abetted such crime; three, a co-principal in such crime committed

the crime of assault with a deadly weapon; and four, the crime of murder was a natural and probable consequence of the commission of the crime of assault with a deadly weapon."

At this point, the prosecutor requested and was granted a bench conference. She pointed out that the court had not added "or assault with force likely to produce great bodily injury" to "assault with a deadly weapon," which would be consistent with the other assault instructions. The prosecutor acknowledged that she had prepared the instruction and was responsible for the omission. Defense counsel said, "I think it's harmless error if you just write it in there on the instruction and move on." The prosecutor asked the court to provide the phrase "verbally," but the court decided to simply write it on the instructions that were provided to the jury.

In a supplemental brief, defendant raises a number of claims of error regarding this instruction. Principally, he contends the instruction was misleading because it identified the crime of murder as the "target offense" and assault with a deadly weapon as the coprincipal's crime, a reversal of the proper designations. (See *People v. Prettyman* (1996) 14 Cal.4th 248, 267 [58 Cal.Rptr.2d 827, 926 P.2d 1013]; CALJIC No. 3.02.) Defendant also finds fault with the court for omitting two paragraphs from CALJIC No. 3.02, for failing to provide oral instruction on assault likely to produce great bodily injury, and for not reinstructing the jury with various standard aiding and abetting instructions that were given at the guilt phase.[10]

The Attorney General concedes that the court transposed "murder" and "assault with a deadly weapon" in the first and third enumerated elements of the instruction, but contends the instruction could not have operated to defendant's prejudice. We agree. The fine points of aiding and abetting liability were not properly before the jury. As discussed above, the jury needed only to weigh defendant's violent criminal activity as an aggravating factor, not to determine precisely which crime his acts constituted. In any event, the instruction as given properly informed the jury that in order to hold defendant liable for murder, it would have to find that the murder was a natural and probable consequence of an assault with a deadly weapon.[11] The transposition of murder and assault in the first and third elements of the

---

[10] With respect to all these claims, defendant asserts violations of his rights under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, sections 1, 7, 13, 15, 16, and 17 of the state Constitution.

[11] Defendant argues that the court's failure to orally add "or assault with force likely to produce great bodily injury" was significant because defendant did not see the weapon in Gornick's hand. This is incorrect; defendant testified that he saw the weapon shortly after the fight began, when Gornick was stabbing Flemming. In any event, this omission could not have prejudiced defendant, as it limited the jury's options in assessing his aiding and abetting liability.

instruction had only a subtle effect, and could only have made it more difficult for the prosecution to establish defendant's culpability for murder. Taken literally, the instruction could be read to require a finding that he intended to aid and abet a murder, rather than an assault.[12]

The Attorney General also notes, correctly, that the omitted paragraphs about which defendant complains were added to CALJIC No. 3.02 *after* defendant's trial, following this court's decision in *People v. Prettyman, supra*, 14 Cal.4th 248. (See *Prettyman*, at pp. 258, fn. 3, 264.) Defense counsel did not request any expansion of the standard instruction, and none was required under these circumstances. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 106–107 [17 Cal.Rptr.3d 710, 96 P.3d 30].)

Finally, there is no merit to defendant's complaint that the court failed to repeat other aiding and abetting instructions given during the guilt phase. These instructions were given to the jury in written form for use during the penalty deliberations, and the jury was told to refer to the applicable guilt phase instructions.

### 4. *The Instruction on Possession of Razor Blades*

Deputies testified that on three occasions they found blades broken out of plastic razors in defendant's jail cell. The court instructed the jury that a prisoner's possession of a sharp instrument, including a razor blade, is a felony, and that "[e]vidence has been introduced for the purpose of showing that the defendant has committed the following criminal acts: . . . possession of a sharp instrument while in custody, which involved the express or implied use of force or violence or the threat of force or violence. Before a juror may consider any of such criminal acts as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant did, in fact, commit such criminal acts." The court rejected defense counsel's request to amend this standard instruction (CALJIC No. 8.87) to tell the jury that it must determine whether there was an express or implied use of force or violence. The court noted that counsel was free to argue this point to the jury.

Defendant contends the instruction was improper, both because razor blades in a jail cell do not rise to the level of an actual or implied threat of

---

[12] Defendant contends the prosecutor's arguments concerning the natural and probable consequences doctrine were likely to have exacerbated the confusion created by the flawed version of CALJIC No. 3.02. He particularly objects to her claim that he was guilty of murder under the natural and probable consequences doctrine, even under his own version of the events. There was nothing improper about this line of argument, nor does defendant explain how it related to the misidentification of the target offense in the jury instruction.

force or violence, and because the instruction created a mandatory presumption of violence.[13] We have repeatedly rejected these arguments. In *People v. Wallace* (2008) 44 Cal.4th 1032, 1082 [81 Cal.Rptr.3d 651, 189 P.3d 911], *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1152 [124 Cal.Rptr.2d 373, 52 P.3d 572], and *People v. Tuilaepa* (1992) 4 Cal.4th 569, 588–589 [15 Cal.Rptr.2d 382, 842 P.2d 1142], we held that possessing contraband razor blades in custody constitutes an "express or implied threat to use force or violence" under section 190.3, factor (b). We have also consistently ruled that whether criminal acts pose a threat of violence is a legal question for the trial court, and that CALJIC No. 8.87 does not create an unconstitutional mandatory presumption. (E.g., *People v. Lewis* (2008) 43 Cal.4th 415, 530 [75 Cal.Rptr.3d 588, 181 P.3d 947]; *People v. Gray* (2005) 37 Cal.4th 168, 235 [33 Cal.Rptr.3d 451, 118 P.3d 496]; *People v. Nakahara* (2003) 30 Cal.4th 705, 720 [134 Cal.Rptr.2d 223, 68 P.3d 1190].) Defendant offers no persuasive reason for us to reconsider these holdings.

### 5. *Applicability of Guilt Phase Instructions*

The court instructed the jury: "You are to be guided by previous instructions given in the first phase of this trial which are applicable and pertinent to the determination of penalty. However, you are to completely disregard any instructions given in the first phase which had prohibited you from considering pity or sympathy for the defendant. In determining penalty, the jury shall take into consideration pity and sympathy for the defendant."

■■■ Defendant recognizes that the court was not required to reinstruct the jury with guilt phase instructions, as a general rule. However, he contends the court's penalty phase instructions were misleading and incomplete because the court did not specify which guilt phase instructions were applicable, and because it *did* repeat two guilt phase instructions, one defining "possession" and one on witness credibility. Thus, defendant argues, the jury may have believed that only the repeated instructions were applicable, and not other critical instructions like the definition of "reasonable doubt." Defendant also claims the jury may have been misled by the court's instruction to disregard the prohibition on considering sympathy, because that guilt phase instruction had also informed the jury not to consider the consequences of its

---

[13] He claims violation of his rights to due process under the Fourteenth Amendment to the federal Constitution and article I, sections 7 and 15 of the state Constitution; to a reliable penalty verdict under the Eighth Amendment to the federal Constitution; and to a fair trial by an impartial jury under the Sixth Amendment to the federal Constitution.

verdict. He asserts that the jurors may improperly have continued to ignore the consequences of the penalty verdict.[14]

These claims are meritless. The court was not required to specify the applicable guilt phase instructions. (*People v. Rogers* (2006) 39 Cal.4th 826, 903–904 [48 Cal.Rptr.3d 1, 141 P.3d 135].) Nor was it necessary to reinstruct the jury on reasonable doubt. (*Rogers*, at p. 905; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1191 [36 Cal.Rptr.2d 235, 885 P.2d 1].) It makes no difference that the court repeated two guilt phase instructions. The jury was provided with all guilt phase instructions in writing and told to consider those that were pertinent to their penalty deliberations. Defendant's suggestion that the court's direction to consider pity and sympathy may have led the jury to disregard the consequences of its decision strains credulity. We presume that jurors are intelligent and capable of understanding and applying the court's instructions. (*People v. Lewis* (2001) 26 Cal.4th 334, 390 [110 Cal.Rptr.2d 272, 28 P.3d 34].)

### 6. *CALJIC No. 8.88*

Defendant contends the court erred by giving CALJIC No. 8.88, governing the weighing of aggravating and mitigating circumstances, and by refusing various proposed defense instructions on related points.[15] His arguments cannot be squared with this court's consistently expressed views on CALJIC No. 8.88.

First, defendant challenges the denial of a proposed instruction that would have conditioned a death sentence on jury findings, beyond a reasonable doubt, that the aggravating circumstances outweighed the mitigating circumstances, and that death was the appropriate punishment. Defendant recognizes that we have rejected the claim that CALJIC No. 8.88 must include these requirements, but asks us to reconsider our view in light of *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], and *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]. However, "[n]othing in *Apprendi* . . . , *Ring* . . . , or *Blakely* . . . casts doubt on these conclusions. [Citations.]" (*People v. Parson* (2008) 44 Cal.4th 332, 370 [79 Cal.Rptr.3d 269, 187 P.3d 1].)

Defendant asserts that, at a minimum, the standard of proof by a preponderance of the evidence is required as a matter of due process. He did not

---

[14] Defendant asserts violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, sections 7, 15, and 17 of the state Constitution.

[15] Defendant refers to the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, sections 7, 15, 16, and 17 of the state Constitution.

submit such a proposal below. In any event, it is settled that "the trial court need not and should not instruct the jury as to *any* burden of proof or persuasion at the penalty phase." (*People v. Blair* (2005) 36 Cal.4th 686, 753 [31 Cal.Rptr.3d 485, 115 P.3d 1145], italics added.) "The death penalty law is not unconstitutional for failing to impose a burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1066 [47 Cal.Rptr.3d 467, 140 P.3d 775]; accord, *People v. Hoyos* (2007) 41 Cal.4th 872, 926 [63 Cal.Rptr.3d 1, 162 P.3d 528].)

Next, defendant claims the court should have given an instruction telling the jury to render an individualized moral determination about the appropriate penalty. He argues that this instruction is superior to CALJIC No. 8.88, which advises the jury that "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." We have repeatedly held that the standard instruction is constitutionally sufficient. (E.g., *People v. Lindberg* (2008) 45 Cal.4th 1, 52 [82 Cal.Rptr.3d 323, 190 P.3d 664]; *People v. Moon* (2005) 37 Cal.4th 1, 42–43 [32 Cal.Rptr.3d 894, 117 P.3d 591].) CALJIC No. 8.88 properly advised the jury of its responsibility to make an individualized moral assessment of the appropriate penalty: "The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider."

Defendant also contends the court should have given his proposed instruction informing the jury that it could, but was not required to, impose the death penalty if aggravating circumstances outweighed mitigating circumstances, whereas it *was* required to return a verdict of life without possibility of parole if mitigating circumstances predominated. This instruction was argumentative and misstated the terms of section 190.3, which requires the death penalty if the jury finds that aggravating circumstances outweigh mitigating circumstances. (See *People v. Anderson* (2001) 25 Cal.4th 543, 599 [106 Cal.Rptr.2d 575, 22 P.3d 347].) It is settled that CALJIC No. 8.88 properly instructs the jury on the balancing of aggravating and mitigating circumstances. (E.g., *People v. Lindberg, supra*, 45 Cal.4th at p. 52; *People v. Moon, supra*, 37 Cal.4th at pp. 42–43.)

Finally, defendant claims the court erroneously refused this proposed instruction: "You need not find any mitigating circumstances in order to

return a sentence of life without possibility of parole. A life sentence may be returned regardless of the evidence." Defendant offers no authority for the proposition that a jury may reach its sentencing determination "regardless of the evidence." CALJIC No. 8.88 correctly advises the jury on its discretion to reject the death penalty. (*People v. Ray* (1996) 13 Cal.4th 313, 355–356 [52 Cal.Rptr.2d 296, 914 P.2d 846]; *People v. Roybal* (1998) 19 Cal.4th 481, 525–526 [79 Cal.Rptr.2d 487, 966 P.2d 521].)

### 7. *CALJIC No. 8.85*

Defendant also argues that CALJIC No. 8.85, which instructs the jury on aggravating and mitigating circumstances, is constitutionally defective, and that the court should instead have given various instructions proposed by the defense.[16]

Defendant fails to provide any persuasive reason for us to reconsider our many holdings rejecting such challenges. Specifically, defendant claims the standard instruction is defective because it fails to advise the jury which sentencing factors are aggravating, mitigating, or either, and does not inform the jury that the absence of a mitigating factor cannot be considered an aggravating factor. We have disagreed with these arguments. (E.g., *People v. Richardson* (2008) 43 Cal.4th 959, 1035–1036 [77 Cal.Rptr.3d 163, 183 P.3d 1146]; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1266–1269 [74 Cal.Rptr.2d 212, 954 P.2d 475].)

Defendant contends the court erred by rejecting proposed instructions providing guidance on aggravating and mitigating factors, and considerations of compassion and mercy. However, "CALJIC No. 8.85 is both correct and adequate. [Citations.] The court need not give pinpoint instructions regarding what mitigating evidence the jury may consider or special instructions regarding mercy and compassion. [Citations.]" (*People v. Valencia* (2008) 43 Cal.4th 268, 309–310 [74 Cal.Rptr.3d 605, 180 P.3d 351].) Defendant also asserts that certain of his proposed instructions would have cured deficiencies in the standard instruction by advising the jury that it need not agree unanimously on mitigating factors, and that no burden of proof applies to the consideration of such factors. These claims are meritless. (*People v. Riggs* (2008) 44 Cal.4th 248, 328 [79 Cal.Rptr.3d 648, 187 P.3d 363].)

### 8. *Juror Unanimity*

Defense counsel proposed instructions requiring the jury to unanimously agree that aggravating factors existed beyond a reasonable doubt, that aggravating circumstances outweighed mitigating circumstances, and that death

---

[16] He claims violations of his federal rights to due process and a reliable penalty determination under the Fifth, Eighth, and Fourteenth Amendments.

was the appropriate punishment. Defendant argues that these instructions were erroneously rejected by the trial court. He also claims it was improper to give CALJIC No. 8.87, which told the jury that it need not unanimously agree on the other-crimes evidence, but that only those jurors who were convinced beyond a reasonable doubt could consider that evidence in aggravation.[17]

The court did not err. Defendant's proposed instruction incorrectly imposed the standard of proof beyond a reasonable doubt. We have rejected defendant's claim that the *Apprendi* line of cases requires that standard for death penalty determinations. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1142 [81 Cal.Rptr.3d 614, 189 P.3d 880]; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1059 [63 Cal.Rptr.3d 82, 162 P.3d 596].) Nor is the standard instruction defective for failing to require juror unanimity. (*Mungia*, at p. 1142; *Barnwell*, at p. 1059.)

### 9. *The Clarifying Instruction on Aggravation*

CALJIC No. 8.88 includes the following sentence: "An aggravating factor is any fact, condition or event attending the commission of a crime which increases its severity or enormity, or adds to its injurious consequences, which is above and beyond the elements of the crime itself." During deliberations, the jury sent a note to the court asking: "(1) Can you clarify 'attending the commission of a crime which . . .' (2) How's 'attending' meant? (3) And a little clarification as a whole on the definition of aggravating factor or evidence."

The court met with counsel, and decided to give the jury four alternative phrases for "attending," but no additional definition of "aggravating factor." Both counsel agreed with this approach. The jury was brought in and the court told them that in place of "attending," they could substitute "connected with," "and surrounding circumstances of," "accompanying," or "associated with." The court added, "if you need any further readback or any further clarification, we'll attempt to do that as soon as possible. Just write it out on another note, and we'll be happy to provide that for you."

Defendant contends the court's failure to provide further clarification deprived him of his Sixth, Eighth, and Fourteenth Amendment rights to a fair trial, an impartial jury, due process, and a reliable penalty determination. He notes that before sending this query, the jury had requested a readback of testimony about defendant's drug habit, and then sent a notice of deadlock. Subsequently, it requested a readback of the deputies' testimony regarding the

---

[17] Defendant invokes the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

Flemming murder, and sent another notice of deadlock. From these circumstances, defendant infers that the jury was confused about aggravating factors and the court failed to dispel the confusion.

Defendant waived this claim by agreeing to the court's response below. In no sense were his substantial rights affected so as to obviate the necessity of an objection pursuant to section 1259. Although it was invited to seek further clarification by the court, the jury did not ask any more questions about aggravating factors. Evidently, the court's provision of alternatives for "attending" resolved the jury's uncertainties. In any event, it is settled that further explanation of the standard instructions on this point is not required. (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1018 [30 Cal.Rptr.2d 818, 874 P.2d 248], citing cases.)

10. *The Instructions Responding to Notices of Deadlock*

a. *Background*

On the afternoon of the third day of deliberations, the jury sent the court a note reading: "We are a hung jury at this point. It appears to be a final decision." The court informed counsel of this development by telephone, and excused the jury for the day. The next morning, Thursday, April 4, the court sought counsel's advice as to how it should respond, having provided them with a proposed instruction.

The prosecutor believed the jurors had not deliberated long enough to declare an irrevocable deadlock, and asked the court to tell them to resume deliberations with an open mind and "an eye towards coming to a resolution." The prosecutor had no objection to the court's proposed instruction. Defense counsel indicated he would like to hear from the jurors about whether their position was truly a final one. He had no objection to the court's proposal, except for the final sentence, which he wanted to delete. The court declined that request, but told counsel it would also be making some other comments and that it would give them the opportunity to place further objections and suggestions on the record.

The jury was brought in and the court asked the foreman if there had been any change since the previous day. The foreman said there had not. The court told the jury that it had a few comments, and "a very special instruction that I want you to pay very close attention to." It then made the following statement:

"Ladies and gentlemen, [there are] three points that I want to make to you before I give you this instruction . . . . And I just want to give you a

shorthand way of remembering them. And they all really are saying the same thing, [that] I want you to stay flexible, keep your options open, and take your time.

"Stay flexible, keep your options open, and take your time.

"Probably not unlike some of you, . . . after I got this note yesterday, I had a difficult time sleeping last night. So I found myself waking up early this morning; so I decided to walk to work. I only live three or four miles away. So I walked along the ocean. I highly recommend it to all of you. Do it tonight; do it tomorrow morning; do it this weekend; do it next week. But it's a way to clear the cobwebs. It allows you to just kind of take a deep breath, take a step backwards, and keep things in perspective.

"The first thought I had this morning while walking here was, first of all, asking you all to give more than what you've already given. To have 16 wonderful people give up eight weeks of their lives to sacrifice, come in here every day, I found it truly amazing that you were willing to do that initially. What we've done to you and your families and the sacrifice you have already given is tremendous. We recognize that. We appreciate that.

"I'm going to be asking you for a little bit more, too.

"My second thought was what we've shared here together. There have been a few light moments we've all shared. There have been some very heavy dramatic moments. I think all of us can say we've lived through a lot in going through this.

"My third thought, though, turned immediately to what other people have already sacrificed and given on this case. If you can imagine what [defense counsel] and [the prosecutor], the sacrifice and the time that they have given this case—we're not talking days or weeks here; we are talking months; we are talking years. This case has been going on since March of 1994. I don't need to remind you of that. That's two years. So here we are two years later in time with a great deal of sacrifice on behalf of attorneys, parties, the witnesses, for a two-year period.

"Having all those thoughts, those three things in mind, I came to the conclusion, I said how inappropriate it would be for me to allow you to say, really after only two days to say 'we can't decide this case, Judge. We're going home, goodbye.' I don't think any of you [want that] to happen, and I'm not going to allow it to happen.

"You went out late Monday afternoon. This is Thursday morning. It's really only been Tuesday and Wednesday. Let's keep that in mind. These

witnesses all deserve more than that. These attorneys deserve more than that. Long Beach deserves more than that. San Pedro deserves more than that. I think all of you would agree. We need to give more than that. Even though it's a most difficult decision, deliberation is a difficult, difficult process, but proof, it is a process. All of you are learning about that process right now.

"Let me give you a very silly, silly example, but I think it will drive home the point about what a process this is. If I were to say to the 12 of you right now 'let's go to lunch right now. Where do you want to go?' We would have a very difficult time getting 12 individuals to agree if we are going to have Chinese, Mexican, Italian, American hamburgers. In order for us to go to lunch, we would all have to agree. That is a very silly elementary example, and I—I don't want to demean at all this process. After all, the decision you are making is between life and death. There is no weightier decision. There is no heavier decision to be made. But it is a decision, and deliberation is a process of 12 very unique individuals. It takes a process not only so much of talking but of listening; listening with the ability to be convinced.

"Now, if there is anyone here of the 12 that have some hidden agenda, and I hope that's not the case, but someone who misspoke, and that can happen, going through jury selections, telling all of us that 'yes, I'm in a position, judge, I'm in that neutral position, that third-party position that you are looking for, and I can truly choose between these two awful choices. I can make that decision.'

"That's because that's what all of you told us. If you truly can't, if you can't choose life under these circumstances, if you can't choose death, then you have to tell us that, first of all. You have to be honest with yourself and with all of us.

"I'm going to assume that you are not in that category, that there [are] no hidden agendas here, and someone is saying, 'I really couldn't choose under any circumstances either one of these choices,' or whatever. 'It's just too heavy,' and so forth, and I'm assuming that's not the case. If it is, you must tell me. You must bring that out to us.

"But the process is the same in regards to going out to lunch, in regards to listening to each other with a disposition to being convinced.

"Now, please keep in mind my second point. Keep all your options open. I was in a hurry in presenting these witnesses, getting it to you, and so forth, and all of you responded so magnificently. I mean we took a break at 10:00 until 10:15, and you were buzzing us at 10:14. We were asking you to come in at nine, and your were all here at nine. You have been wonderful in that regard.

"Now is not the time to rush anything. It's to take your time. You are time qualified until April the 26th. We have plenty of time here, folks; so slow down.

"Also, next week we were scheduled to have off for spring break. I don't know if you want to take that or not. You are more than welcome to take it. If you want to start that spring break today, take it; go home until April the 15th. Take that deep breath. Walk along the ocean. These are heavy thoughts. These are heavy decisions. Take your time individually and take your time in a deliberative process of talking to each other.

"If you want to work today, take tomorrow off, come back next week, that's fine. If you want to take today and tomorrow off and come back Monday, that's fine. . . . It's all up to you 12. Decide among yourselves. 'Do we need a break here? Do we need that three, five, seven days off? Let's come back on the 15th and start again on our deliberations.'

"All those options are open to you. Keep those options open until we run out of time, until everyone has to go back to their daily lives, and so forth. As long as we have the time, take the time. You deserve the time, they deserve the time, the community deserves the time; so take it; you've got it; so take the time.

"I want to emphasize one thing before I give you this instruction. We're not here just after a decision. We are after the right decision. That takes time to give to the right decision.

"Let me read this instruction to you. Listen very carefully. What I'm going to do is I'm going to have the clerk give you a copy of this just like the other instructions. I not only want to read this in open court here, but I want your foreperson to read it back there to you. Then I want each one of you to read this to yourself; pass it around; read it to yourselves at least once. It is there available to you. Take all the time you need.

"Listen very carefully:

"Although the verdict to which a juror agrees must, of course, be his or her own verdict, the result of his or her own convictions, and not a mere acquiescence in the conclusion of his or her fellows, yet in order to bring 12 minds to a unanimous result, you must examine the question submitted to you with candor and with a proper regard and deference to the opinions of each other. Remember that you are not partisans or advocates in this matter; you are impartial judges of the facts.

"Each of you must consider the evidence for the purpose of reaching a verdict, if you can do so. Each of you must decide the case for yourself, but should do so only after discussing the evidence and instructions with the other jurors. And with this view, it is your duty to decide the case, if you can conscientiously do so. In conferring together, you ought to pay proper respect to each other's opinions and listen with a disposition to be convinced to each other's arguments."

The jury resumed deliberating at 9:55 a.m., and broke for the day at 11:05 a.m. The next day, the jury met from 10:00 a.m. until 3:00 p.m., and decided to take the following week off. It had requested and received 12 copies of the special instruction the court gave after the notice of deadlock.

The jury returned on Monday, April 15. On the 17th, it requested a readback of the deputies' testimony "regarding the time frame of Flemming's murder." On the 18th, just after noon, the jury again reported that it was deadlocked, sending the court this note: "Your Honor, conscientious decisions have been made. We finalized our thoughts in a vote yesterday afternoon, but chose to take another day to stop and think about our positions and why we decided the way we did. Today we came in and read the special instruction you gave us again before beginning. We then deliberated further in the hope of coming to a unanimous decision. Unfortunately, we are unable to do so and each person has stated they have come to an individual, conscientious decision that they feel is appropriate and just in this matter. There is no change foreseeable in our decisions."

The court told counsel that it would "make further inquiry," but did not anticipate any change in the jury's position. In that case, the court said it would declare a mistrial. It discussed possible dates for resetting the matter with counsel. The prosecutor asked the court to find out what the split among the jurors was, "because that could be very important as to how we proceed in this case in the future." The court said it intended to do that, and to ask each juror individually about their ability to come to a decision. Unless anyone indicated that there was some possibility of a decision after further deliberations, a mistrial would be declared. The court and counsel then agreed on a date for retrying the penalty phase, and discussed procedures for making the jurors available to counsel for a discussion of their views of the case.

When the jury returned, the court commented, "at least I can't ask you to spend any more time. You have been at this for some time, ladies and gentlemen. Obviously, the purpose of this hearing this afternoon is in regards to your note that you sent out . . . . Let me make a couple inquiries, because I am not going to let you off that easy.

"First of all, to the foreperson. . . . I want you to listen very carefully to my question and answer only my question. I am not, first of all, asking with regards to which way in any way that these numbers are leaning. I am not asking for that. But I would like a numerical breakdown of your last polling."

The foreperson replied that the split was 11 to one. The court then said: "I want to ask each one of you a very difficult question. There is obviously an easy answer for you to give me, and you will all go home. You have been at this a long time. I am sure you have given it a great deal of thought, as your note has indicated. But my question to each one of you is if this court were to give you additional time, we could provide you with additional readback, we could give you further interpretation of the law if there was some legal problem, any of those things, but if we gave you additional time, is there a possibility, not a probability—I am asking is there a possibility that this jury could come to a verdict?"

The court first sought a response from the foreperson, who said: "From what I have seen at this point, no, I do not believe so." The court then asked Juror No. 2 the same question. This juror said, "I think so." The court responded: "With that, ladies and gentlemen, I am going to ask the 12 of you to go back in that jury room. Thank you very much. I appreciate it. I am going to ask you to continue on in your deliberations." The jury went back at 2:32 p.m. At 9:15 the following morning, it reported that it had reached a verdict.

### b. *Discussion*

Defendant claims the court erred by (1) giving an initial instruction that unfairly favored the prosecution, with comments that introduced improper considerations into the deliberations, and (2) refusing to accept the second notice of deadlock, instead coercing the holdout juror by inquiring into the numerical division of the jury. He contends he was denied his rights to a fair and impartial jury under the state and federal Constitutions, his state constitutional right to a unanimous verdict, and his federal right to a reliable death penalty verdict. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, § 16.) These claims lack merit.[18]

---

[18] Defense counsel objected only to the last sentence of the court's initial instruction, despite the court's invitation to place further objections on the record. On appeal, defendant makes no argument concerning the effect of the last sentence of that instruction standing alone. Rather, his arguments depend as well on portions of the instruction to which no objection was made. Accordingly, we consider his appellate claims only to determine whether the instructions affected his substantial rights. (§ 1259.) Apart from considerations of waiver, we note that defense counsel's failure to object tends to "indicate[] that the potential for coercion argued now was not apparent to one on the spot." (*Lowenfield v. Phelps* (1988) 484 U.S. 231, 240 [98 L.Ed.2d 568, 108 S.Ct. 546].)

The trial court described the instruction it gave after the first notice of deadlock as a "watered-down version of an old *Allen* instruction." In *People v. Gainer* (1977) 19 Cal.3d 835 [139 Cal.Rptr. 861, 566 P.2d 997], this court noted that the term "*Allen* charge" encompassed "a variety of permutations and amplifications" of wording in a controversial instruction that was given to a deadlocked jury in *Allen v. United States* (1896) 164 U.S. 492 [41 L.Ed. 528, 17 S.Ct. 154]. (*Gainer*, at p. 845; see *id.* at p. 843, fn. 3.) The *Gainer* court identified two aspects of *Allen* instructions that introduced "extraneous and improper considerations into the jury's debates," and held that "it is error for a trial court to give an instruction which either (1) encourages jurors to consider the numerical division or preponderance of opinion of the jury in forming or reexamining their views on the issues before them; or (2) states or implies that if the jury fails to agree the case will necessarily be retried." (*Gainer*, at p. 852.)

The instruction given by the court in this case included neither of these improper elements.[19] Defendant faults the court for failing to remind the jurors not to abdicate their firmly held beliefs. Plainly, however, the first clauses of the instruction did just that, emphasizing the point with the interjection "of course." The second paragraph of the instruction also reminded the jurors that "each of you must decide the case for yourself." Contrary to defendant's assertions, nothing in the instruction referred to the preponderance of opinion among the jurors.

Defendant complains that the instruction did not repeat language from CALJIC No. 17.40 advising the jury, "do not decide any question in a particular way because a majority of the jurors, or any of them, favor that decision." Because this language was included in the court's original penalty phase instructions, he speculates that its omission after the notice of deadlock might have led minority jurors to believe that the instructions had changed, and that they now could be influenced by the majority. But no juror would have taken that view after being told that the verdict must be "the result of [your] own convictions, and not a mere acquiescence in the conclusion of [your] fellows."

---

[19] For ease of reference, we repeat the court's instruction: "Although the verdict to which a juror agrees must, of course, be his or her own verdict, the result of his or her own convictions, and not a mere acquiescence in the conclusion of his or her fellows, yet in order to bring 12 minds to a unanimous result, you must examine the question submitted to you with candor and with a proper regard and deference to the opinions of each other. Remember that you are not partisans or advocates in this matter; you are impartial judges of the facts.

"Each of you must consider the evidence for the purpose of reaching a verdict, if you can do so. Each of you must decide the case for yourself, but should do so only after discussing the evidence and instructions with the other jurors. And with this view, it is your duty to decide the case, if you can conscientiously do so. In conferring together, you ought to pay proper respect to each other's opinions and listen with a disposition to be convinced to each other's arguments."

Defendant also claims the court failed to remind the jury that it could remain deadlocked. Twice, however, the court alluded to this possibility, telling the jurors to pursue "the purpose of reaching a verdict, *if you can do so*," and that it was their "duty to decide the case, *if you can conscientiously do so.*" (Italics added.) No more was required.

Defendant contends the court's comments before and after this special instruction improperly referred to considerations of hardship suffered by the court itself, the attorneys, and the Cities of Long Beach and San Pedro. He argues that these comments unduly introduced concerns over the waste of government resources if no verdict were reached and a retrial became necessary. Defendant also claims the court's statement that the cities, the parties, and the witnesses "deserved better" suggested that a penalty verdict was "deserved." These inferences are unwarranted. The court's comments were explicitly and emphatically directed at the brief amount of time the jury had spent deliberating. The court made no reference to the subject of costs, the prospect of a retrial, or the desirability of a verdict.

The court's comparison of the penalty deliberations to the process of deciding as a group on a place to go to lunch is also criticized by defendant, as an impermissible minimization of the jury's responsibility and a diminution of the state's burden of proof. The court's analogy was not well chosen, and we do not endorse its use. However, defendant's substantial rights were not affected by these comments, considered in their context. The court repeatedly acknowledged that it was using a "silly example," and stressed the weighty and grave nature of the decision faced by the jurors.

Next, defendant argues that the court's comments about a possible "hidden agenda" on the part of any juror who might not be able to deliberate in good faith improperly targeted the minority juror or jurors. The record, of course, does not reflect what the breakdown of the jury was at this point in the deliberations, but assuming that a minority opposed the death penalty, the court's comments clearly did not have a coercive effect. The jury resumed deliberations and continued for days, requesting and receiving readbacks of the testimony and eventually reporting a second deadlock. No prejudice to defendant's substantial rights appears.

■ Defendant claims the court's response to the second notice of deadlock was improper. We disagree. The court was scrupulous in its handling of the second notice, informing the jury that this time it could not ask them to prolong the deliberations, and narrowing its inquiry to two specific points: the numerical breakdown of the jurors' votes, and each juror's opinion on the possibility of reaching a verdict. It is settled that a court may inquire into the numerical division of the jury in a deadlock during the

penalty phase, and that whether there is a "reasonable probability" of agreement is a matter committed to the trial court's discretion. (§ 1140; see *People v. Breaux* (1991) 1 Cal.4th 281, 319 [3 Cal.Rptr.2d 81, 821 P.2d 585].) "Any claim that the jury was pressured into reaching a verdict depends on the particular circumstances of the case." (*People v. Pride* (1992) 3 Cal.4th 195, 265 [10 Cal.Rptr.2d 636, 833 P.2d 643].)

Here, the court's decision to inquire whether there was a "possibility" of reaching a verdict, rather than a "reasonable probability" in the terms of section 1140, was within its discretion. The court steered well clear of pressuring the jurors into reaching a verdict, telling them, "There is obviously an easy answer for you to give me, and you will all go home." The jurors could not have construed this comment as a request for a verdict, because the court was simply asking each of them in open court for his or her view of the mere possibility of a verdict if deliberations were to resume. There was no pressure on the holdout juror, when the court told the entire panel that no extra time could be demanded of the jury at that point, and that everyone would be sent home if they agreed a verdict could not be reached. Nothing in the court's comments tended to dissuade any juror from maintaining his or her position. The court did not abuse its discretion when it directed the jury to resume deliberations. (*People v. Pride, supra,* 3 Cal.4th at p. 265.)

### F. *Cumulative Error*

Defendant contends the cumulative effect of the errors at his trial requires reversal of his conviction and sentence, even if none was individually prejudicial. As we have found no substantial error in any respect, this claim must be rejected.

### G. *Miscellaneous Challenges to the Death Penalty Statute*

Defendant presents familiar challenges to California's death penalty statute, without providing persuasive justifications for us to reconsider our settled views. Written findings on the jury's sentencing choice are not required by the federal Constitution. (E.g., *People v. Parson, supra,* 44 Cal.4th at p. 370; *People v. Harris, supra,* 43 Cal.4th at p. 1322.) The death penalty does not violate the Eighth Amendment, international law, including article VII of the International Covenant of Civil and Political Rights, or "evolving standards of decency." (E.g., *People v. Lindberg, supra,* 45 Cal.4th at p. 54; *Harris,* at p. 1323.) Nor is review for intercase proportionality constitutionally compelled. (E.g., *Lindberg,* at p. 54; *Harris,* at pp. 1322–1323.)

## III. DISPOSITION

We affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied August 12, 2009, and the opinion was modified to read as printed above. Moreno, J., and Werdegar, J., did not participate therein.