Filed 4/22/16  P. v. Guzman CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ANTONIO CRUZ GUZMAN,<br><br>    Defendant and Appellant. | F069165<br><br>(Super. Ct. No. CRM027614)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Marc A. Garcia, Judge.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri and Eric L. Christoffersen, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Antonio Cruz Guzman (defendant) stands convicted, following a jury trial, of first degree murder involving the personal use of a deadly and dangerous weapon. (Pen. Code,[1] §§ 187, subd. (a), 12022, subd. (b)(1).) He was sentenced to prison for 25 years to life plus one year, and ordered to pay various fees, fines, and assessments. On appeal, we hold the evidence is sufficient to sustain the jury's finding of first degree murder, the trial court did not err by instructing on flight, and defendant has failed to establish ineffective assistance of counsel. We affirm the judgment.

# I

## PROSECUTION EVIDENCE

As of April 28, 2013, Christyn Aguilar resided in a house on Valencia Way in Atwater, with her mother, Bonnie Aguilar; other family members; and Andrew Sanchez.[2] Christyn's boyfriend, Carlos Belmonte, stayed there occasionally, as did Joseph McDonald, who had been living in a detached garage since sometime in 2012.

On April 28, McDonald began drinking beer around 10:00 a.m. or possibly a bit earlier. He continued drinking into the afternoon, when other people started to arrive at the house for a barbecue. Rachel Sanchez, Andrew's mother, arrived about 11:00 a.m. Defendant, Andrew's coworker, arrived around noon in his red or burgundy truck, then remained outside with Bonnie, Andrew, and McDonald. All were drinking. As far as Christyn could tell as she went back and forth in and out of the house, everything was peaceful and calm.

According to Bonnie, there was a running argument between defendant and McDonald concerning defendant's boots. Over the course of several hours, the argument

---

[1]     All statutory references are to the Penal Code unless otherwise stated.

[2]     Undesignated dates in the statement of facts are to the year 2013.

Because several persons involved in this case share last names, we refer to them by their first names for clarity. No disrespect is intended.

flared up, died down, and then flared up again a number of times.[3]  At some point, McDonald put his hands on Bonnie in a disrespectful manner.  He kept touching her and she kept pushing him away, then finally defendant stepped in and was able to get McDonald to stop touching her.  Defendant told McDonald multiple times, "Don't bite the hand that feeds you."  Defendant did not raise his voice.  According to Rachel, however, Bonnie was intoxicated and was hitting and antagonizing McDonald, and trying to get defendant to beat McDonald up.  She kept whispering in defendant's ear, then took him in a room for 30 minutes.  This was about 1:00 p.m.  When defendant came out, he had an attitude toward McDonald.

Between 4:00 and 4:30 p.m., Belmonte was getting ready to start the grill for the barbecue.  Bonnie, defendant, McDonald, and Andrew were sitting near the grill.  All were drinking beer.  Defendant and McDonald were sitting about three or four feet apart.  When Belmonte first saw them, they seemed to be conversing.  Within about 30 seconds, however, they started arguing.  McDonald's voice was raised and he acted as if he was angry.  Defendant's voice was not raised, but it appeared, from the look on his face, that he was starting to get mad.

The argument lasted no more than a minute, with McDonald doing most of the talking.  At some point, McDonald got out of his chair and walked toward defendant, who was still seated.  Standing over defendant, McDonald told him, "If you have a problem, say it to my face and we'll take it to the back."  Defendant then stood up.  McDonald was still angry, while defendant still appeared calm.

According to Rachel, McDonald got up when Bonnie slapped him.  McDonald said that was enough, then defendant said something to him and pointed his finger in

---

[3]     Bonnie had known defendant for at least three years.  She had never seen him be aggressive, even when drinking.

3.

McDonald's face. McDonald responded, "No man points his finger in my face," and "Let's take it around the corner." Defendant got angry.

Belmonte recalled McDonald and defendant walking down the driveway toward the back of the house. Belmonte followed them, because he thought they were "going to go toe-to-toe." He believed McDonald was drunk. McDonald started walking first, and passed defendant's truck. Defendant went to the driver's side of his truck. He opened the door, leaned inside, and appeared to be looking for something. He emerged a few seconds later and ran at McDonald. A white plastic sheath went flying from defendant's vicinity. Defendant had to run about 15 feet to reach McDonald, who was standing with his fists clenched about the level of his waist, like he was ready to fight. McDonald did not have anything in his hands.

Defendant started swinging a machete at McDonald in an up-and-down manner. The first blow — a powerful swing — struck the right side of McDonald's neck. McDonald brought his arms up to try to defend himself, but defendant continued to swing the weapon. At least some of the blows made contact with McDonald's body. Three to four of the swings were to McDonald's left side, like defendant was trying to get the left side of McDonald's neck. The swings were too fast for Belmonte to count, but there were more than four. They were constant, fluid motions, with no pauses in between.

Rachel recalled McDonald and defendant walking toward the backyard at the same time. Rachel was walking with McDonald and trying to calm him down. Defendant, who was slightly ahead of them, went straight to his truck and reached in the passenger side. Rachel saw defendant get something out of his truck, then saw the machete strike McDonald's face. Although McDonald had squared off with his hands up to fight, he did not push or strike defendant, or make any type of aggressive hand movement. Nevertheless, defendant went straight to the truck, then kind of ran at McDonald and struck him in the face with the machete. Defendant then "persistently" swung the machete at McDonald's upper body. McDonald had nothing in his hands and

4.

did not land any blows.  Rachel believed defendant swung at least eight or nine times. Before the first blow, McDonald said to defendant, "It's like that, huh?"  Defendant said nothing.  During the attack, McDonald kept telling Rachel to run, but she could not, because defendant pointed the machete at her and told her not to move.

McDonald was bleeding profusely, with blood squirting from his neck.  Defendant backed away from him, then quickly went toward the back of the house and tossed the machete inside the attached garage.  According to Belmonte, defendant had a blank expression on his face.  Belmonte did not hear him say anything.  Belmonte heard Christyn start to come outside, and he told her to go back in and call 911.  Defendant ran to his truck and drove away.  Belmonte did not "believe that he burned rubber, but he left pretty quickly."  They made eye contact for a couple of seconds.  Defendant looked angry.

According to Rachel, after defendant ran toward the back of the house, he came up to her, looking confused and terrified, like he was in shock.  He asked what he did, and she pointed at McDonald.  Defendant looked at McDonald and then back at Rachel, and he told her to shut her mouth and not say anything.  He then left quickly in his truck. McDonald asked Rachel for help.  He hugged her, asked what happened and who did it, and whether he (McDonald) was wrong.

Atwater Police Officer Dasilva was dispatched to the residence at approximately 5:16 p.m. and arrived shortly after.  He located a bloody machete in the garage.  He received information as to two possible locations the suspect might be found.  When he responded to the second one — a trailer park on Crest Road — he was informed by a neighbor that the trailer in question was occupied by an 11-year-old boy.  The boy's mother was contacted and gave permission to enter.

Both doors to the trailer were locked.  Dasilva knocked, but there was no response, so he kicked in the main door.  He and Corporal Echevarria searched one side of the trailer, while Detective Richards and Officer Torres searched the other.  Shortly after

5.

entry, Dasilva heard Torres yelling, "Show me your hands." Dasilva immediately proceeded to Torres's location in the west bedroom. There, Dasilva observed defendant and a boy lying on the bed, under the covers. Torres continued to give commands, but defendant did not comply with them. He had his hands concealed and the boy was a potential hostage, so Dasilva used his Taser on defendant. Defendant was then taken into custody. Richards did not smell any alcohol in the room, which was very small, and he did not observe any objective signs defendant was intoxicated.

The autopsy revealed McDonald sustained 14 chopped and incised wounds from a sharp-edged object. One wound, which involved the lower side of the face from the jaw to behind the ear, was a little more than six inches long and gaped open about one and a half inches. It severed one of the jugular veins on the right side of the neck. There were also chop injuries to the forearms and palm side of the hands and fingers. Some were quite deep. They were defensive injuries. At some point, McDonald tried to save himself by grabbing the blade. The cause of death was chopped and incised wounds of the head, neck, and arms. McDonald's blood tested negative for drugs, but his blood-alcohol level was 0.245 percent.

## II

### DEFENSE EVIDENCE

Defendant testified that on the morning of April 28, he was with his family at home in the Crest Road trailer park. He telephoned Andrew, who was going to loan him $100. They met outside Bonnie's house at around 10:45 a.m., then defendant drove Andrew to a liquor store where Andrew could cash his check. At the store, Andrew cashed his check, gave defendant the loan, and bought some beer. They returned to Bonnie's house just before noon.

Defendant parked in the driveway, then he and Andrew moved to the front part of the house near the garage. There were a patio and chairs, and Bonnie, Belmonte, and Rachel were present. Defendant did not recall McDonald being there at that time. They

6.

all sat together, drinking beer and talking for about an hour. There was no arguing that defendant could recall.

Prior to this date, defendant did not really know McDonald, although he had seen McDonald when he (defendant) went to the house to see Andrew. On April 28, defendant saw McDonald walking back and forth between the back garage and defendant's truck, then he came over and "started to be aggressive." McDonald told Bonnie she was "a bitch," and Bonnie told him to stop "talking shit." Defendant tried to calm them down so the situation would not get worse. In a normal voice, he said McDonald should not treat Bonnie like that, because she was renting to him and giving him food. Defendant did not say this directly to McDonald, however.

At some point, Bonnie and defendant went inside the house. Bonnie said McDonald was being aggressive "maybe because he was drinking," and that he had tried to hit her. She told defendant to be careful.

Defendant returned to the patio area and sat back down. He tried to ignore McDonald, because he was afraid and did not want problems. Referring to defendant's boots, McDonald said he could make much better boots in prison, because those were just Mexican boots. McDonald, who was standing in front of defendant, tried to grab defendant's foot.

Defendant rose and told Andrew and McDonald that he did not want problems and was leaving. McDonald followed him and called him names, like he wanted to fight. Defendant was headed to his truck, and he tried to walk faster because he could hear McDonald behind him, telling him to stop and asking if defendant wanted to fight with him.

When defendant reached his truck, he tried to ignore McDonald. He opened the passenger door for a few seconds to see if McDonald would just walk on by. He closed the door when he realized McDonald was right behind him. McDonald said defendant

7.

was a "pussy" and struck him in the arm.[4]  Defendant fell against the side of the truck.  McDonald then came up and said, "This is where I'm going to kill you."

Terrified, defendant grabbed the machete that was lying in the bed of his truck and tried to defend himself from McDonald's blows.[5]  Defendant was backing up, but McDonald kept hitting him.  At some point, the cover came off the machete.  Defendant recalled swinging the machete to defend himself.  McDonald was cut when defendant was trying to block his blows.  Everything happened very quickly.  When defendant was swinging the machete at McDonald, he felt "terrible fear" and his legs were shaking.  Defendant actually thought he might die.  He remembered McDonald trying to grab the machete.[6]

When McDonald stopped hitting him, defendant ran away.  He went to the garage and put the machete with his tools.[7]  He then went home.  He went in his room and tried to calm down.  When the police came, he did not try to hide.  They did things to scare defendant's son, however, so defendant waited with the boy while they came in.

Between the time he arrived at Bonnie's house to the time of the incident with McDonald, defendant consumed approximately six beers.  He thought he "[p]ossibly" was feeling some effects from the alcohol, and he was not thinking clearly because he

---

[4]    A photograph taken of defendant on May 10 showed a bruise on defendant's right arm.  Richards and Torres testified in rebuttal that they saw defendant with his shirt off following his arrest on the night of the incident.  Neither noticed any bruising on his arms or upper body.

[5]    Defendant was aware the machete was in the truck on this day.  He had purchased it at a store a few months earlier.  Although he did not use it in his construction job, he sometimes had to cut branches from the tree at his house or when he was hired for odd jobs.

[6]    As far as defendant could remember, Rachel was nowhere near McDonald during the fight.  Defendant denied telling her not to move or raising the machete toward her.

[7]    Defendant did not usually store his tools there, but had left them when he dropped Andrew off, because he was planning to clean his truck.

8.

was so afraid. Defendant did not consider himself an aggressive person; he had never been in a fist fight before.

Griselda Lopez, who had known defendant approximately eight or nine years and had two children with him, testified she had never heard anyone say defendant was violent or acted aggressively when drinking. In her opinion, he was a calm, peaceful person.

Vivian McDonald, McDonald's ex-wife, testified concerning a physical altercation that occurred between her and McDonald on June 17, 2010.

## DISCUSSION

### I

#### SUFFICIENCY OF THE EVIDENCE

Defendant contends the evidence was insufficient to support the jury's finding the killing was willful, deliberate, and premeditated. Accordingly, he argues, if the murder conviction is allowed to stand, it must be reduced to second degree murder. We disagree.

The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson*, *supra*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). "Where the circumstances support the trier of fact's finding of guilt, an appellate court cannot reverse merely because it believes the evidence is

9.

reasonably reconciled with the defendant's innocence.  [Citations.]"  (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1747.)  Rather, "[r]eversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'  [Citation.]"  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"All murder which is perpetrated by means of . . . any . . . kind of willful, deliberate, and premeditated killing, . . . is murder of the first degree."  (§ 189.) "[W]illful" simply means "intentional."  (See *People v. Moon* (2005) 37 Cal.4th 1, 29.) A verdict of premeditated murder requires more than a showing of intent to kill, however. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)  " 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance.  [Citations.]"  (*Ibid.*)  Planning, motive, and manner of killing are pertinent to a determination of whether premeditation and deliberation exist (*People v. Marks* (2003) 31 Cal.4th 197, 230; *People v. Perez* (1992) 2 Cal.4th 1117, 1125; *People v. Anderson* (1968) 70 Cal.2d 15, 26-27), "but these factors are not exclusive nor are they invariably determinative.  [Citation.]"  (*People v. Marks*, *supra*, 31 Cal.4th at p. 230; see *People v. Thomas* (1992) 2 Cal.4th 489, 517.)  "[W]hile premeditation and deliberation must result from ' "careful thought and weighing of considerations" ' [citation], [the California Supreme Court] continue[s] to apply the principle that '[t]he process of premeditation and deliberation does not require any extended period of time.' "  (*People v. Bolin*, *supra*, 18 Cal.4th at p. 332.)  "Premeditation and deliberation can occur in a brief interval.  'The test is not time, but reflection.  "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' [Citation.]"  (*People v. Memro* (1995) 11 Cal.4th 786, 863.)

Defendant's arguments notwithstanding, there is ample evidence supporting the jury's finding of premeditation.  We recognize the evidence showed only that defendant carried the machete in his vehicle for use as a tool, not that he placed it there in

10.

anticipation of a violent encounter. (Cf. *People v. Lee* (2011) 51 Cal.4th 620, 636; *People v. Elliot* (2005) 37 Cal.4th 453, 471; *People v. Steele* (2002) 27 Cal.4th 1230, 1250.) Nevertheless, while there was no evidence of extensive planning or preparation, there was evidence that after arguing with McDonald and being challenged to a fight by him, defendant calmly walked directly to his truck, searched for and retrieved the machete he admitted he knew was there, then immediately rushed at the unarmed McDonald and began deliberately to inflict blows that were intended to be fatal. From this evidence, a rational trier of fact could have concluded defendant "acted after a period of reflection rather than on an unconsidered or rash impulse" (*People v. Brady* (2010) 50 Cal.4th 547, 564), and thus that he actually premeditated and deliberated, as opposed to having merely had the time to consider his actions (see *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1270).

In light of the foregoing, sufficient substantial evidence supports the jury's verdict of first degree murder. (See, e.g., *People v. Nelson* (2011) 51 Cal.4th 198, 213; *People v. Manriquez* (2005) 37 Cal.4th 547, 577; *People v. San Nicolas* (2004) 34 Cal.4th 614, 658-659; *People v. Bolin*, *supra*, 18 Cal.4th at pp. 332-333; *People v. Sanchez* (1995) 12 Cal.4th 1, 34, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) That jurors could have concluded defendant acted pursuant to an unconsidered and rash impulse, and so was guilty, at most, of second degree murder, is immaterial. (See *People v. Booker* (2011) 51 Cal.4th 141, 173.)

## II

### INSTRUCTION ON FLIGHT

The trial court instructed the jury pursuant to CALCRIM No. 372, as follows: "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the

defendant fled cannot prove guilt by itself."[8]  Defendant now contends the trial court erred by instructing on flight because there was no evidentiary support for such an instruction.  That being the case, he argues, the instruction unconstitutionally lessened the prosecution's burden of proof.  We conclude the instruction was properly given.[9]

"It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference.  [Citation.]"  (*People v. Hannon* (1977) 19 Cal.3d 588, 597, disapproved on another ground in *People v. Martinez* (2000) 22 Cal.4th 750, 761-762; see *People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)  "In general, a flight instruction 'is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt.'  [Citations.]  ' "[F]light requires neither the physical act of running nor the reaching of a far-away haven.  [Citation.]  Flight manifestly does require, however, a purpose to avoid being observed or arrested." '  [Citations.]"  (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.)

Whenever the prosecution relies on evidence of a defendant's flight as tending to show guilt, an instruction on flight must be given.  (§ 1127c.)  "To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence.  [Citation.]"  (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.)

---

[8]    The trial court asked for, and both counsel agreed to, a stipulation the reading of the instructions need not be reported.

[9]    The Attorney General asserts the claim has been forfeited by defendant's failure to object to the instruction in the trial court.  The California Supreme Court having rejected this argument (e.g., *People v. Cage* (2015) 62 Cal.4th 256, 285; *People v. Boyce* (2014) 59 Cal.4th 672, 691, fn. 12; *People v. Rogers* (2013) 57 Cal.4th 296, 332, fn. 5; *People v. Wallace* (2008) 44 Cal.4th 1032, 1074, fn. 7; *People v. Smithey* (1999) 20 Cal.4th 936, 982, fn. 12), we do likewise.  Accordingly, we do not address defendant's alternative argument defense counsel was ineffective for failing to object.

12.

The evidence of flight need not be uncontradicted. (*People v. Richardson* (2008) 43 Cal.4th 959, 1020.)

In the present case, there was evidence defendant quickly left the scene without either attempting to assist or summoning help for McDonald, and returned home. Although "[*m*]*ere* return to familiar environs from the scene of an alleged crime does not warrant an inference of consciousness of guilt [citations]" (*People v. Turner* (1990) 50 Cal.3d 668, 695; see *People v. Pensinger* (1991) 52 Cal.3d 1210, 1244), the prosecution's evidence, if believed, showed defendant did not merely return home and go about his normal activities. Rather, after beating a hasty retreat from the bloody scene of events, he hid in his bedroom, did not respond to law enforcement officers when they arrived at his trailer, and, even after they forced entrance, continued to hide and then refused to comply with their commands until one officer shot him with a Taser. Under the circumstances, the instruction was properly given. (See, e.g., *People v. Jackson* (1996) 13 Cal.4th 1164, 1226; *People v. Turner*, *supra*, 50 Cal.3d at p. 695.)

The California Supreme Court repeatedly has rejected claims the standard flight instruction creates an unconstitutional permissive inference or lessens the prosecution's burden of proof.[10] (E.g., *People v. Cage*, *supra*, 62 Cal.4th at p. 286; *People v. Boyce*, *supra*, 59 Cal.4th at p. 691; *People v. Avila* (2009) 46 Cal.4th 680, 710; *People v. Kelly* (2007) 42 Cal.4th 763, 792.) Although these cases considered the version of the instruction contained in CALJIC No. 2.52, we have reached the same conclusion with respect to CALCRIM No. 372. (*People v. Hernández Ríos* (2007) 151 Cal.App.4th 1154,

---

**10** A permissive inference allows, but does not require, the trier of fact "to infer the elemental fact from proof by the prosecutor of the basic one and . . . places no burden of any kind on the defendant. [Citation.]" (*Ulster County Court v. Allen* (1979) 442 U.S. 140, 157.) Instruction on such an inference "is invalid as a matter of due process only if there is no rational way the jury could draw the permitted inference. [Citations.]" (*People v. Pensinger*, *supra*, 52 Cal.3d at pp. 1243-1244.)

1159.)  To the extent defendant is arguing the instruction had such an effect *when applied specifically to him*, we reject his claim in light of the evidence presented at trial.

Defendant says, however, that the instruction "authorized the jury to draw the inference that since [defendant] left the scene of the shooting and went back home, he killed Joseph McDonald with malice and did not act in self-defense."  He says jurors could not rationally have made this connection on the facts of the instant case; hence, the instruction undermined the presumption of innocence.  We disagree.

So-called perfect and imperfect self-defense — as to both of which the jury was instructed — each requires an actual fear of imminent harm.  (*People v. Butler* (2009) 46 Cal.4th 847, 868.)  The California Supreme Court has explained that "the flight instruction, as the jury would understand it, does not address the defendant's specific mental state at the time of the offenses, or his guilt of a particular crime, but advises of circumstances suggesting his *consciousness that he has committed some wrongdoing*. [Citations.]" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1160, disapproved on another ground in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.)  In the present case, the instruction was supported by the evidence, and flight was relevant to the issue whether defendant had an actual belief his life was in imminent danger and so he bore no criminal responsibility for McDonald's death.  (See *People v. Zambrano*, *supra*, at p. 1160.)

## III

### INEFFECTIVE ASSISTANCE OF COUNSEL

Rachel spoke to a police officer on the day of the incident.  She said she did not see what happened, but heard screaming from the backyard, walked outside, and saw blood shooting out of McDonald.  She then applied a towel and helped him lie down. When she spoke to a defense investigator on June 14, she maintained she arrived at the residence around 4:00 p.m., went inside to take a shower, and came back outside to find McDonald bleeding and defendant's truck gone.  After the morning session of the first day of the evidentiary portion of trial, however, Rachel informed both counsel that she

witnessed the entire incident.  As a result, the prosecutor — who had not planned on calling Rachel — called her as his witness.

Rachel's testimony is summarized in the statement of facts, *ante*.  She admitted lying to the defense investigator and the police, and defense counsel thoroughly cross-examined her concerning her prior statements.  Defense counsel subsequently argued to the jury that some things Rachel said probably were true, but when people who have been in such a shocking, traumatic situation look back at what happened, their brains "try[] to put the puzzle together, and that's exactly what happened with Rachel."  Counsel argued Rachel might have seen McDonald get cut, but her testimony about standing right next to McDonald when he was being cut, and defendant telling her not to move, did not "ring true."  Defense counsel did not ask the court to give CALCRIM No. 318, which would have told jurors:

> "You have heard evidence of [a] statement[s] that a witness made before the trial.  If you decide that the witness made (that/those) statement[s], you may use (that/those) statement[s] in two ways:
>
>> "1.  To evaluate whether the witness's testimony in court is believable;
>>
>> "AND
>>
>> "2.  As evidence that the information in (that/those) earlier statement[s] is true."

Defendant now says failure to request the instruction constituted ineffective assistance of counsel.  We are not persuaded.

The burden of proving ineffective assistance of counsel is on the defendant. (*People v. Pope* (1979) 23 Cal.3d 412, 425.)  "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable

probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.)

"If the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 367.) In other words, "in assessing a Sixth Amendment attack on trial counsel's adequacy mounted on *direct appeal*, competency is *presumed* unless the record *affirmatively* excludes a rational basis for the trial attorney's choice. [Citations.]" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260, original italics.)

Prior inconsistent statements are admissible, pursuant to Evidence Code section 1235, "to prove their substance as well as to impeach the declarant. [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1144, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)[11] CALCRIM No. 318 tells jurors they may reject in-court testimony if they determine inconsistent out-of-court statements are true. (*People v. Hudson* (2009) 175 Cal.App.4th 1025, 1028; see *People v. Coffman and*

---

[11] Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."

Evidence Code section 770 states: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."

16.

*Marlow* (2004) 34 Cal.4th 1, 62-63.)  A trial court has no duty to give such an instruction absent a request, however.  (*People v. Griffin* (1988) 46 Cal.3d 1011, 1026.)

The record on appeal sheds no light on why defense counsel did not request CALCRIM No. 318.  It appears her strategy was to concede Rachel was present, but attack her credibility both by showing she lied on prior occasions, and suggesting her most recent account of events could not be trusted because the incident was so traumatizing.  This latter strategy assailed Rachel's testimony without doing so in such a way that the prosecutor was likely to respond by emphasizing Rachel's testimony she lied initially because she had been threatened.  The strategy also had the effect of indirectly calling Belmonte's account into question.  Under the circumstances, we cannot say this strategy was unreasonable, or that there could be no satisfactory explanation for counsel's failure to request CALCRIM No. 318.  Accordingly, we reject defendant's claim.  (See *People v. Bell* (1989) 49 Cal.3d 502, 546.)

Even assuming defense counsel did not make a constitutionally reasonable choice to forgo CALCRIM No. 318, defendant has not shown he was prejudiced as a result.  Jurors were instructed to determine the credibility of witnesses, and that in evaluating testimony, they could consider anything that reasonably tended to prove or disprove the truth or accuracy of the testimony, including, inter alia, whether the witness made a statement in the past that was inconsistent with his or her testimony, and whether the witness admitted to being untruthful.  Jurors were told that if they decided a witness deliberately lied about something significant, they should consider not believing anything that witness said.  In addition, jurors were told that in deciding whether the People had proved their case beyond a reasonable doubt, the jurors were *required* to consider *all* the evidence that was received *throughout the entire trial*.  Thus, as far as the jury was concerned, Rachel's entire testimony — including the prior inconsistent statements to which she herself testified — was admitted for all purposes and could be believed or disbelieved in whole or in part.  (See *People v. Griffin*, *supra*, 46 Cal.3d at p. 1026.)

17.

## **DISPOSITION**

The judgment is affirmed.

_____
DETJEN, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
FRANSON, J.