Filed 4/15/21  P. v. Hernandez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>FERNANDO HERNANDEZ et al.,<br><br>    Defendants and Appellants. | E072249<br><br>(Super.Ct.No. FSB17003026 &<br>FSB17003027)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Ronald M. Christianson, Judge.  Affirmed.

Michael B. McPartland, under appointment by the Court of Appeal, for Defendant and Appellant, and Krista Hemming for Fernando Hernandez.

William G. Holzer, under appointment by the Court of Appeal, for Defendant and Appellant, Adrian Rene Haro.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael P. Pulos, Seth Friedman and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I.  INTRODUCTION

On August 7, 2017, J.C. was shot following an altercation with several men.  A jury convicted Fernando Hernandez (Hernandez) and Adrian Haro (Haro)[1] of attempted murder arising out of this incident (Pen. Code,[2] §§ 664, 187, subd. (a)).  The jury also found true special allegations that defendants' commission of the offense was willful, deliberate, and premeditated (§ 664, subd. (a)); a principal was armed with a firearm (§ 12022, subd. (a)(1)); and Hernandez personally used a firearm and personally and intentionally discharged a firearm in the commission of the offense (§ 12022.53, subds. (b), (c)).

Haro appeals, arguing (1) there was insufficient evidence to support his conviction for attempted murder, and (2) the trial court engaged in prejudicial error by failing to sua sponte instruct the jury on self-defense, defense of another, and imperfect self-defense.  Hernandez also appeals, arguing only that he received ineffective assistance of counsel because his trial counsel failed to request a pinpoint instruction on provocation and failed to adequately argue provocation in his defense.  We affirm the judgment.

---

[1]  A third individual, Alexander Rivera (Rivera), was also charged and convicted of various offenses related to the incident, but he is not a party to this appeal.

[2]  All future statutory references are to the Penal Code unless otherwise stated.

## II. FACTS AND PROCEDURAL HISTORY

### A. *Facts and Charges*

On August 7, 2017, law enforcement officers were called to respond to reports that a man had been shot. A responding police officer discovered J.C., who appeared to have sustained a leg wound, and who reported that he had been shot following an argument with two men. A witness to the shooting subsequently identified Hernandez and Haro as the men involved and further identified Hernandez as the shooter.

In a first amended information, both Hernandez and Haro were charged with attempted murder (§§ 664, 187, subd. (a), count 1) and assault with a firearm (§ 245, subd. (a)(2), count 2). Additionally, the information alleged defendants' actions were willful, deliberate, and premeditated (§ 664, subd. (a)), and that a principal was armed with a firearm in the commission of count 1 (§ 12022, subd. (a)(1)). The information further alleged Hernandez personally inflicted great bodily harm (§ 12022.7, subd. (a)), as well as personally used, intentionally discharged, and caused great bodily harm through discharge of a firearm in the commission of the offenses (§ 12022.53, subds. (b)-(d)).

### B. *Relevant Evidence at Trial*

#### 1. Testimony of J.C.

J.C. testified that in August 2017, he was homeless and living in an abandoned commercial building with three other people in the City of San Bernardino. In the afternoon of August 7, 2017, one of those individuals exited the abandoned building to urinate. Soon after, Haro, Hernandez, and Rivera approached the building; Hernandez

3

kicked open the front door and yelled that someone needed to be disciplined for urinating outside. Hernandez was holding a "zip gun," which J.C. described as a pipe with metal wires and a rubber band spring, assembled together in a way that resembled a nine-millimeter handgun.[3] J.C. stated that the exchange was heated, and he attempted to speak to everyone to calm them down. During this encounter, Haro repeatedly stated: "Let's do him." According to J.C., Haro appeared to be attempting to incite Hernandez to shoot J.C. with the zip gun while making this statement. J.C. did not feel it was safe to attempt to exit the building because a third man had positioned himself near the back door, while Hernandez and Haro remained at the front door during this exchange.

When the situation did not seem to de-escalate, J.C. pulled out a knife because he felt threatened. In response, Haro, Hernandez, and Rivera left. After about 10 to 15 minutes, J.C. exited the building to retrieve clothes he had left drying on a fence outside. By this time, J.C. believed the argument with the three men was over. While retrieving his clothes, J.C. heard someone say, " 'I got you now,' " from behind him; he then turned around and saw Hernandez holding a shotgun. When J.C. attempted to run, Hernandez shot him. J.C. made his way back into the abandoned building, in pain and bleeding; but Hernandez followed him yelling, "Get out!"

J.C. proceeded to exit the building and make his way to a nearby retail store where he knew there was a security guard with a gun. While attempting to get to the store, he

---

[3] A police officer also explained to the jury that a "zip gun" is a term used to refer to a homemade gun that acts as an explosive device, which is usually some type of tube with a spring-loaded mechanism that fires a single bullet.

turned around several times and saw Haro and Rivera following him in a vehicle. J.C. stated that Haro and Rivera drove the vehicle close to him in the parking lot of the store, but he managed to get inside the store to ask for help.

J.C. admitted having prior convictions for giving false information to a police officer, willful discharge of a firearm, and false imprisonment. Additionally, on cross-examination, J.C. admitted he had no right to be living in the abandoned building at the time of the incident, and that he knew there were children living nearby.

2. Testimony of Witness R.N.

R.N. testified that on August 7, 2017, he was stopped at an intersection while driving his vehicle. He heard yelling on the street and observed Hernandez run toward a vacant commercial building and fire a short-barreled shotgun. He also observed Haro running about 10 feet behind Hernandez. After Hernandez fired his shotgun, R.N. observed both men return together to a residence located on the same street. R.N. called 911 and reported he had witnessed two men shoot an African-American man in the leg outside an abandoned building before returning to a nearby residence; he also observed a vehicle leave the residence but could not identify who was inside the vehicle.

3. Testimony of Police Officer

An officer with the San Bernardino Police Department testified that on August 7, 2017, he was dispatched to a commercial retail store in response to reports of a shooting. He met J.C. outside the store and observed J.C. was bleeding from wounds caused by buckshot or birdshot. He proceeded to speak with J.C. while he summoned medical aid.

5

The officer's interview with J.C. was recorded through the officer's body camera and played for the jury. J.C. reported that he was inside a vacant building with two women and another man when the man went outside to urinate. J.C. stated that following this incident, a Mexican man about 50 to 60 years old with a long beard and baseball hat kicked down the door to the building and pointed a zip gun at J.C. He recalled a second man accompanied the man holding the zip gun. In response, J.C. grabbed a knife and the men left. However, J.C. heard the man holding the zip gun state, " 'Wait here, motherfucker,' " as he was leaving. When the men left, J.C. exited the building to retrieve clothes he had left hanging outside. J.C. reported that while outside, he encountered the man who had been holding the zip gun; heard the man say, " 'You wanna play, motherfucker?' "; and was shot as he attempted to turn around and go back into the building.

The officer testified that he had an opportunity to view the video surveillance footage of the retail store where he first encountered J.C. The surveillance video depicted Haro and Rivera arriving at the retail store in a gray vehicle following J.C.'s arrival; Haro slipping an item under the back of his pants and under his tank top while exiting the vehicle; and both Haro and Rivera walking toward the entrance of the retail store before turning around and walking back toward the vehicle in which they had arrived.

The officer also had an opportunity to examine the area where the shooting occurred. He observed birdshot damage to the front door and surrounding wall of an abandoned commercial building, as well as to a pair of jeans hanging on a fence outside the building. No shotgun shells were recovered in the immediate area and, as a result, the

officer estimated any shotgun must have been discharged from approximately 20 to 30 yards away from J.C.

The officer participated in a search of the nearby residence where Hernandez was arrested. Shotgun shells were discovered in a bedroom of the residence, and two handguns were found in a garage that had been converted into a living area. However, investigators did not find a shotgun or zip gun during this search.

### 4. Testimony of Sheriff's Deputy

A deputy with the San Bernardino County Sheriff's Department testified that on August 7, 2017, he was driving in his patrol car when he saw J.C. walking down a street with his hands pressed over a bleeding wound on his leg. The deputy also saw Hernandez, Haro, and a third man walking in the opposite direction toward a residence. Hernandez appeared to be carrying a firearm wrapped in white material, and Haro was walking next to him. The deputy attempted to turn his vehicle around to stop the men on the street, but he could not do so in time to prevent them from entering the residence. As a result, the deputy parked his vehicle next to the abandoned building to surveil the residence. During this time, he observed Haro and the third man leave the residence in a silver vehicle. The vehicle returned in approximately five minutes, and the deputy saw the two men return inside the residence. The deputy did not see Hernandez leave the residence.

### 5. Testimony of Police Detective

A detective with the San Bernardino Police Department testified that on the afternoon of August 7, 2017, he was called to a residence and arrived to find a police

perimeter set up. He used a public address system to order the individuals within to exit the residence. In response, Hernandez exited the residence, followed by Haro and then several other individuals. He assisted with the collection of gunshot residue samples from Hernandez and Haro following their exit from the residence. He also assisted with an in-field identification with R.N., who identified Hernandez and Haro as the individuals referred to in R.N.'s 911 call, and who specifically identified Hernandez as the shooter.

6. Gunshot Residue Evidence

A criminalist who processed the gunshot residue samples collected from Hernandez and Haro found no gunshot residue from the samples taken from Haro's hands, but he discovered gunshot residue from a sample taken from one of Hernandez's hands. He explained that this suggested Hernandez was within 12 feet of a discharging firearm, but he also admitted that it was possible for someone to be near a discharging firearm and to have no residue on his person. He also stated that it was possible for gunshot residue to transfer from an individual to a surface by handling the object.

7. Testimony of Defendant Haro

Haro testified in his own defense. He explained that he lived in a house with his wife, his five children, Hernandez, and Hernandez's wife. Another man lived in a converted garage on the property, and Mr. Hernandez's brother lived in a recreational vehicle parked on the same property. On August 7, 2017, Haro, his wife, and his children witnessed a man urinating outside a nearby abandoned, commercial building. Haro knew that people had been living in the abandoned building for the past month. In response,

8

Haro, Rivera, and Hernandez's brother[4] walked over to the abandoned building. Haro saw that Hernandez's brother was carrying a pipe with a cloth over it, but he believed the item under the cloth was only a pipe.

When he entered the abandoned building, Haro recalled seeing J.C. and three other people who appeared to be smoking methamphetamine. He told the people inside the abandoned building that they needed to leave. However, when he noticed that J.C. was holding a machete and another man was holding a hammer, Haro began to back up. Hernandez's brother stated, " 'I got something for you, motherfucker,' " and left, while Haro returned to his residence to retrieve a bat.

As Haro made his way back to the abandoned building, Haro saw Hernandez's brother run ahead; heard Hernandez's brother cursing and shouting; saw Hernandez's brother aim a pillow case at J.C.; and heard a loud bang. Haro claimed he did not know Hernandez's brother had a gun until after it was discharged because it was hidden under a pillow case. He did not see what happened to J.C. and only saw Hernandez's brother running around the abandoned building, cursing. A short time later, Haro saw J.C. make his way toward a nearby retail store, and Haro and Rivera decided to follow him. Upon arriving at the retail store, Haro noticed J.C. had been shot in the leg, so they immediately returned home. When they returned home, Hernandez's brother, as well as a car belonging to Hernandez's brother, was gone. Haro never saw Hernandez's brother again.

---

[4] Throughout his testimony, Haro maintained that it was Hernandez's brother, and not Hernandez, who was involved in the incident, testifying that the two looked similar.

8. Testimony of Hernandez and Family

Hernandez's wife testified that on August 7, 2017, she was at home watching television with Hernandez when they heard an argument outside the home. They went outside, encountered Hernandez's brother, and heard him say he had shot someone. She admitted that she did not initially inform police about Hernandez's brother and contacted law enforcement only after Hernandez had been charged with a crime.

One of Hernandez's sons testified that Hernandez was disabled and could barely walk following a work-related injury and two automobile accidents. Hernandez testified on his own behalf and corroborated the testimony of his wife and son.

9. Testimony of Defendant Rivera

Rivera testified that on August 7, 2017, he was sleeping on the couch in the living room of his brother's (Haro) home. Haro woke him up and asked him to tell the people in the abandoned building nearby that they needed to leave. They made their way together toward the abandoned building with Hernandez's brother[5] ahead of them. Haro told Rivera to stand outside the building in case a fight ensued, and Rivera remained outside about 10 to 15 feet away from the building, as Haro followed Hernandez's brother inside. He heard arguing inside the building, which ended when he heard

---

[5] Like Haro, Rivera maintained that it was Hernandez's brother, and not Hernandez, who accompanied them during this incident.

Hernandez's brother say, " 'Let's go.' " As Hernandez's brother exited the building, he handed Rivera a pipe,[6] which Rivera tossed to the side on their way back to Haro's home.

After they arrived back at the residence, Rivera observed Haro go into a bedroom. He also observed Hernandez's brother leave the residence, return with a gun inside a pillow case, leave the residence again, and walk back toward the abandoned building. He then observed Haro follow Hernandez's brother out the front door of the residence while holding a baseball bat. He thought Hernandez's brother intended simply to scare the people inside the abandoned building, not to shoot anyone.

Rivera did not accompany Haro and Hernandez's brother out of the house. From the window of the residence, Rivera observed Hernandez's brother run toward the abandoned building and fire his gun. Eventually, Haro came back into the house followed by Hernandez's brother. Rivera heard Hernandez's brother state: " 'I shot him. I shot that motherfucker,' " before Hernandez's brother stepped into a green car and drove away. Rivera and Haro then drove in a gray car toward the direction they believed J.C. had fled. They followed J.C. to a nearby retail store, parked their car, and followed J.C. inside the store. However, they left after confirming that J.C. had been shot in the leg.

C. *Verdict and Sentencing*

The jury returned a verdict finding Hernandez and Haro guilty on the attempted murder charge (§§ 664, 187, subd. (a), count 1) but not guilty on the charge of assault

---

[6] Rivera also referred to the object as a "little pole" in other portions of his testimony.

with a firearm (§ 245, subd. (a)(2)). The jury also found true the allegations that defendants' commission of the offense was willful, deliberate, and premeditated (§ 664, subd. (a)); and a principal was armed with a firearm in the commission of count 1 (§ 12022, subd. (a)(1)). Finally, the jury returned a true finding that Hernandez personally used a firearm and personally and intentionally discharged a firearm in the commission of count 1 (§ 12022.53, subds. (b), (c)); but the jury found not true the allegations that Hernandez inflicted great bodily injury or inflicted great bodily injury through discharge of a firearm (§§ 12022.7, subd. (a), 12022.53, subd. (d)).

Hernandez was sentenced to 17 years in state prison, representing the midterm of seven years for the attempted murder conviction on count 1 and a consecutive term of 10 years based on the true finding that defendant personally used a firearm in the commission of count 1 (§ 12022.53, subd. (b)).[7]

Haro was sentenced to eight years in state prison, representing the midterm of seven years for the attempted murder conviction on count 1 and a consecutive term of one year for the jury's true finding that a principal was armed with a firearm in the commission of count 1.

---

[7] As to count 1, the trial court struck the enhancement for personal discharge of a firearm under section 12022.53, subdivision (c), and stayed the enhancement that a principal was armed with a firearm under section 12022, subdivision (a)(1).

12

## III. DISCUSSION

A. *Substantial Evidence Supports Haro's Conviction for Attempted Murder*

Haro was convicted of attempted murder under an aiding and abetting theory. On appeal, he contends there was insufficient evidence to support this conviction, arguing: (1) there was insufficient evidence to establish he had the requisite mental state necessary to be convicted as an aider and abettor, and (2) there was insufficient evidence to show he committed any acts that actually assisted in Hernandez's shooting. We disagree.

 1. General Legal Principles and Standard of Review

" 'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' . . . 'Thus, to be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill.' " (*People v. Pettie* (2017) 16 Cal.App.5th 23, 52.)

" 'On appeal[,] we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other

innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508.)  "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*Id.* at p. 508.)

2. Substantial Evidence Supports a Finding that Haro Had the Requisite Shared Intent To Be Convicted as an Aider and Abettor

"To be guilty of a crime as an aider and abettor . . . the person must give such aid or encouragement 'with knowledge of the criminal purpose of the [direct] perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of,' the crime in question.  [Citations.]  . . .  Thus, to be guilty of attempted murder as an aider and abettor, a person . . . must intend to kill." (*People v. Lee* (2003) 31 Cal.4th 613, 623-624; see *People v. Gonzalez* (2012) 54 Cal.4th 643, 654, fn. 8.)

" '[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may . . . be inferred from the defendant's acts and the circumstances of the crime.' " (*People v. Avila* (2009) 46 Cal.4th 680, 701.) " 'Among the factors which may be considered in making the determination of aiding and abetting are:  presence at the scene of the crime, companionship, and conduct before and after the offense.' [Citation.]  . . .  'Evidence of a defendant's state of mind is almost

14

inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054-1055.)

Here, J.C. testified that during his initial encounter with Hernandez and Haro, Hernandez threatened the occupants of the abandoned building while holding a "zip gun"; that during this time Haro repeatedly told Hernandez, "Let's just do him"; and that Haro appeared to be attempting to incite Hernandez into shooting J.C. with the zip gun. Clearly, if believed, this testimony serves as substantial evidence that Haro had the specific intent to kill J.C.

The fact that Hernandez did not immediately shoot J.C. upon Haro's urging does not render Haro's verbal statements irrelevant. Haro himself testified they left the abandoned building upon seeing J.C. brandish a machete and another man brandish a hammer; he and Hernandez returned home to retrieve additional weapons; and the two began to make their way back to the abandoned building with those weapons. This evidence gives rise to a reasonable inference that Haro maintained his previously expressed intent; but he was temporarily deterred by the fact that a zip gun was capable of firing only one shot, and there were at least two men inside the abandoned building with weapons. The fact that both Hernandez and Haro left, only to immediately return with additional weapons more lethal than the one weapon they had during the initial encounter, is also evidence from which the jury could reasonably infer that Haro's previously expressed intent remained unchanged. Thus, the record here contains evidence of a credible and solid value from which the jury could conclude that Haro shared in any intent Hernandez may have had to kill J.C.

15

Haro argues that there was no direct testimony he knew Hernandez was carrying a shotgun during their return to the abandoned building and, as such, the evidence at best suggests he intended merely to confront J.C. or possibly assault J.C. However, "an aider and abettor of a specific intent crime shares the perpetrator's specific intent when he or she knows of the perpetrator's *criminal purpose* and aids, promotes, encourages, or instigates the perpetrator with the intent of encouraging or facilitating the commission of the crime." (*People v. Houston* (2012) 54 Cal.4th 1186, 1224, italics added.) Thus, the necessary mental state requires that an aider and abettor has knowledge of and shares in the criminal purpose of the direct perpetrator. It does not require the aider and abettor to have precise knowledge of the exact means or methods, which the direct perpetrator may ultimately use to commit the crime.

On this point, Haro testified that during the initial encounter, he was not holding any objects but returned home to retrieve a bat. Haro testified he did so specifically because J.C. had brandished a machete and another man held a hammer during the initial encounter. He acknowledged that, at the same time, the man with him was initially carrying something that looked like a pipe covered by cloth[8] but had returned home to retrieve an item covered by a pillowcase. Given Haro's own testimony that he retrieved a weapon in direct response to the fact that the men inside the abandoned building had weapons, it would have been reasonable for the jury to infer that Haro knew whatever item the man with him returned to retrieve was also in response to that fact. Further, the

---

[8] Again, Haro testified it was Hernandez's brother and not Hernandez.

16

jury could reasonably infer that since the man with Haro already held a zip gun during the initial encounter, whatever item he retrieved to continue the confrontation would be some kind of weapon more lethal than the zip gun or pipe he had previously held.[9] The fact that Haro may not have known the specific weapon Hernandez held does not preclude the jury from reasonably concluding that Haro knew of the criminal purpose for which the weapon was intended to be used.

3. Substantial Evidence Supports a Finding that Haro Actively Encouraged and Assisted in the Shooting

Haro also argues there was no evidence that he engaged in words or deeds that actually assisted Hernandez in accomplishing the shooting. However, the record shows both Haro and Hernandez initially left the abandoned building to retrieve additional weapons after seeing J.C. brandish a machete and another man brandish a hammer. Based upon this testimony, it would have been reasonable for the jury to infer Hernandez and Haro were initially deterred for fear of being outnumbered or inadequately armed. Thus, Haro's act of retrieving a bat and following Hernandez back to the abandoned building can be reasonably seen as encouraging and assisting Hernandez in the shooting because that act assured Hernandez he would not be outnumbered during a second encounter. Additionally, Haro's prior statements exhorting Hernandez to "do him"

---

[9] Indeed it would seem unlikely for jurors to believe that Haro assumed Hernandez returned home just to retrieve a pillow case or nonlethal item hidden under a pillow case in light of the fact that Haro admitted he returned home with the specific intent to arm himself with a weapon to further confront the men in the abandoned building.

17

(referring to J.C.) remain relevant evidence in this analysis. The evidence demonstrates exactly what Haro encouraged Hernandez to do. Haro and Hernandez were not able to accomplish this during their initial encounter and, thus, they retrieved additional weapons and returned to the building. Accordingly, substantial evidence in the record supports a reasonable inference by the jury that Haro engaged in specific actions to encourage or assist Hernandez in the shooting. We, therefore, decline to reverse Haro's conviction for attempted murder on this ground.

B. *The Trial Court Did Not Err in Instructing the Jury*

Haro also argues that the trial court erred in failing to instruct on self-defense and imperfect self-defense, or defense of another. We conclude the record does not contain substantial evidence to support giving such instructions and therefore find no error.

1. General Legal Principles and Standard of Review

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.". . . That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) "[A] trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence." (*Id.* at p. 162.)

"[B]oth self-defense and defense of others, whether perfect or imperfect, require an actual fear of *imminent* harm." (*People v. Butler* (2009) 46 Cal.4th 847, 868.) The

subjective element of each of these defenses is identical: the defendant must actually believe in the need to defend against imminent peril. (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 82 ["The subjective elements of self-defense and imperfect self-defense are identical. Under each theory, the appellant must actually believe in the need to defend himself against imminent peril to life or great bodily injury."]; *People v. Trujeque* (2015) 61 Cal.4th 227, 270-271 [Defense of others requires the trier of fact to "find an *actual* fear of an *imminent* harm."].) We review de novo a trial court's decision not to give such instructions. (*People v. Simon* (2016) 1 Cal.5th 98, 133.)

2. Application

Here, Haro has not identified any substantial evidence in the record suggesting that he subjectively believed he needed to defend himself or another from imminent peril, which would support the giving of an instruction on either self-defense or defense of another, whether perfect or imperfect. Haro relies on the fact that J.C. was unlawfully occupying an abandoned building; one of J.C.'s associates allegedly urinated in public outside the building; and, during an initial encounter, J.C. brandished a machete as evidence that would support giving self-defense instructions. However, none of these arguments are persuasive.

The fact that J.C. was unlawfully occupying the abandoned building is not relevant. There was no evidence to suggest the abandoned building belonged to Haro, Hernandez, or any other person associated with Haro. Presumably, Haro equally had no right to be present on the property and, as such, there is no inference of any imminent

threat posed to Haro or any person associated with him arising out of J.C.'s presence in the abandoned building.

The fact that another person associated with J.C. may have urinated in public in view of Haro, Hernandez, their family members, or their children is equally irrelevant to a self-defense instruction. While Haro may have found such an act unseemly, urinating in public without more does not give rise to an inference that the individual poses a threat of imminent harm to anyone. Moreover, it was undisputed that J.C. was not the individual whom Haro witnessed urinating in public. Thus, this fact does not support any inference that J.C. posed any threat of harm to Haro or any other person.

Finally, the fact that J.C. brandished a machete is evidence that might support a finding that Haro held a subjective fear of imminent harm at the time of Haro's initial encounter with J.C. However, it was undisputed that both Haro and Hernandez made their way back to their residence after this initial encounter, and there is no evidence that J.C. was holding any weapon when Hernandez and Haro returned to the abandoned building a second time. The fear necessary to support a self-defense or defense of another instruction must be of imminent harm and cannot be based upon past threats or past assaults. (*People v. Battle* (2011) 198 Cal.App.4th 50, 73.) Thus, such evidence would not support the giving of a self-defense or defense of another instruction in this case, since the subjective fear of imminent harm cannot be based purely upon a past threat. Absent substantial evidence in the record to support a finding that Haro acted out of fear of imminent harm to himself or another at the time of the shooting, there was no

20

basis for the trial court to give an instruction on self-defense or defense of another, whether perfect or imperfect, and we find no error in this regard.

C. *The Record Does Not Support Hernandez's Claim of Ineffective Assistance*

On appeal, Hernandez contends that his conviction must be reversed because he received ineffective assistance of counsel. We disagree.

" ' "In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof." ' " (*People v. Lucas* (1995) 12 Cal.4th 415, 436.) Hernandez's sole argument on appeal is that his trial counsel's performance fell below an objective standard of reasonableness for failure to request a pinpoint instruction regarding provocation[10] and failure to sufficiently argue provocation as a potential defense.

However, in evaluating whether trial counsel's actions fell below an objective standard of reasonableness, we cannot ignore the context in which the alleged failure to act occurred. Here, it was abundantly clear that Hernandez's trial counsel pursued a strategy of arguing mistaken identity as his primary defense. Indeed, multiple defense witnesses testified that it was Hernandez's brother and not Hernandez who shot J.C.

---

[10] "[A]n instruction on provocation for second degree murder is a pinpoint instruction that need not be given sua sponte by the trial court." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1333.) It is undisputed that Hernandez's trial counsel did not object to the instructions as given regarding provocation and did not request any additional pinpoint instructions on this issue.

Having chosen to pursue a defense of mistaken identity, forcefully arguing other defenses such as provocation or self-defense—which require a defendant to harbor a subjective state of mind related to the circumstances of the crime—might have caused Hernandez's counsel to lose credibility with the jury. We do not believe such a strategic decision to pursue one defense over another falls below an objective standard of reasonableness.

We note that our colleagues in the Second District Court of Appeal addressed this very issue under almost identical circumstances in *People v. Jones* (2014) 223 Cal.App.4th 995. There, the defendant argued he received ineffective assistance of counsel due to trial counsel's failure to request a pinpoint jury instruction on provocation. (*Id.* at pp. 1001-1002.) Upon review of the record, the appellate court in that case noted: "[D]efense counsel had two possible theories to present: provocation and mistaken identity. It would have been difficult to present both while retaining credibility with the jury. [Defense counsel] chose the second, and presented evidence to support it as best he could. Given the evidence in the case, counsel cannot be faulted for not succeeding with what he had to work with, concentrating on the weaknesses and inconsistencies in the identification evidence." (*Id.* at p. 1002) Accordingly, it concluded there was no error because defense counsel's tactical choice to pursue the defense of mistaken identity over the defense of provocation did not fall below accepted standards of reasonableness under prevailing professional norms. (*Id.* at pp. 1002-1003.)

The record in this case compels the same conclusion. The fact that Hernandez's counsel chose to pursue a defense of mistaken identity at the time of trial over a seemingly inconsistent defense of provocation does not amount to representation falling

22

below an objective standard of reasonableness. This is particularly true given the number of defense witnesses apparently willing to testify that Hernandez's brother was the true perpetrator of the crime. The choice to pursue one defense instead of the other is not unreasonable, and we conclude Hernandez has failed to establish ineffective assistance warranting reversal.

## IV. DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


FIELDS _____
                                                                    J.

We concur:


MILLER _____
                Acting P. J.


MENETREZ _____
                        J.